# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
:
Elendow Fund, LLC,                                       :        **CIVIL ACTION NO.:**
:
          Plaintiff,                    :        10-cv-9061-TPG ECF CASE
:
            v.                   :
:
Rye Select Broad Market XL Fund, L.P., Rye               :
Investment Management, Tremont Capital                   :
Management Inc., Tremont Group Holdings                  :
Inc., Tremont Partners, Inc., Massachusetts              :
Mutual Life Insurance Co., MassMutual                    :
Holdings LLC, Oppenheimer Acquisition                    :        **COMPLAINT**
Corporation, KPMG LLP, Rupert Allan,                     :
Jim Mitchell, and Robert Schulman,                       :
:        **Jury Trial Demanded**
          Defendants.                   :
---------------------------------------------------------x


Plaintiff, Elendow Fund, LLC ("Elendow"), alleges as follows on information and belief, except for paragraphs 12 and 13 herein, which are based on Plaintiff's personal knowledge. Plaintiff's information and belief is based on the investigation conducted by and through its counsel, which included review of complaints filed by the United States Government, the New York Attorney General, and the Securities and Exchange Commission (the "SEC") relating to the Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff"), papers and pleadings filed in actions commenced by state municipalities, administrative agencies and other investors, private placement memoranda relating to Rye Select Broad Market XL Fund, L.P.  (the "Rye Fund" or the "Fund"), quarterly and periodic reports issued to Plaintiff and other investors in the Rye Fund, news reports published in the financial press, and auditor reports.

**NATURE OF THE ACTION**

1.       This action arises out of the $50 billion Ponzi scheme orchestrated by convicted swindler Bernard L. Madoff.  Thousands of investors from throughout the world fell victim to Madoff's scam that, according to federal authorities, was unprecedented in its size and scope until it imploded in December 2008.

2.       Each of these investors was ensnared in Madoff's scheme in one of two ways. Some victims invested directly with Madoff, while the majority of victims were defrauded by investing indirectly with Madoff through an extensive network of "feeder funds" that provided Madoff with the massive and continuous infusions of monies necessary to sustain his scheme for years.  The managers of those feeder funds pocketed staggering fees from clients who relied on the managers' integrity and purported investing acumen, only to learn that those fiduciaries and purported experts had blindly channeled their assets into the hands of one of history's most reviled confidence men.

3.       Plaintiff brings this action in connection with one of the largest of these now notorious Madoff feeder funds, the Rye Fund, which was operated through defendant Tremont Group Holdings, Inc. as part of the MassMutual Financial Group.

4.       The Rye Fund's managers, and the corporate entities that operated, controlled and/or assisted them, turned a blind eye to Madoff's nefarious operations and reaped handsome fees from Plaintiff for work they never performed.  Motivated by unchecked greed, the persons and entities responsible for the Rye Fund abdicated any notion of fiduciary responsibility owed to Plaintiff and funneled billions of dollars into a scam they should have detected had they made even a modestly diligent effort to do so.  At the same time, these individual and entities disseminated a series of fraudulent and misleading offering memoranda and other documents to

Plaintiff, who reviewed and detrimentally relied on these materials in making investments in the Fund.  These false and misleading materials induced Plaintiff to invest in the Rye Fund, and resulted in approximately $12 million in losses due to the shamefully avaricious conduct of the Rye Fund's managers and the corporate entities that operated, controlled and/or assisted them.

5.     The Rye Fund's managers, and the entities that operated, controlled and/or assisted them, failed to investigate Madoff or monitor what he was doing with their clients' assets. They either recklessly overlooked or disregarded a raft of red flag warnings regarding Madoff's fraudulent scheme.  Gorging on the fees flowing from their relationship with Madoff, the Defendants — all of whom were in a superior position to detect Madoff's fraudulent scheme — did nothing to shield Plaintiff from Madoff's criminal enterprise.

6.     While Plaintiff was relying on the managers of the Rye fund to vet and monitor the entity to which its investments were being entrusted, those managers in fact were merely serving as Madoff's unquestioning sales force that supplied Madoff with the flow of cash necessary to sustain the scam and ensnare an ever widening circle of victims.

7.     Plaintiff seeks to recover its catastrophic losses from Defendant Tremont Partners, Inc., the general partner of the Rye Fund; Tremont Group Holdings, Inc., the corporate parent of that general partner; and the senior executive officers of these entities.

8.     Further, Plaintiff seeks to recover from defendants Massachusetts Life Insurance Company, MassMutual Holdings Company, Oppenheimer Acquisition Corp. and OppenheimerFunds, Inc.  Each of these Defendants maintained extensive influence and control over and provided substantial assistance to the entities that managed and operated the Rye Fund.

9.     By overlooking or disregarding glaring red flags regarding Madoff's criminal enterprise, by disseminating fraudulent offering documents and other materials to Plaintiff, and

by channeling millions of dollars of Plaintiff's assets into the black hole that was Madoff's Ponzi scheme, these Defendants violated the federal securities laws, breached their fiduciary duties, aided and abetted those breaches of fiduciary duty, were unjustly enriched, and breached their contractual obligations to Plaintiff.

<u>**JURISDICTION AND VENUE**</u>

10.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC, as well as under the laws of the states of New York and Delaware.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and pursuant to the supplemental jurisdiction of this Court, 28 U.S.C. § 1367.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because a substantial part of Defendants' conduct giving rise to the causes of action occurred in this District.  Defendants also conduct substantial business in this District

<u>**THE PARTIES**</u>

<u>**Plaintiff**</u>

12.     Plaintiff is a Delaware corporation with its principal place of business located at 1309 South 3rd Street in Bozeman, Montana.  Plaintiff is a small investment fund composed of approximately 35 investors.

13.     Plaintiff invested approximately $12 million in the Rye Fund, all of which was lost as a result of the Defendants' fraudulent statements, acts and omissions.  Approximately $6 million of this amount was invested directly by Plaintiff in the Rye Fund through purchases of interests between January 2008 and November 2008.  The remaining $6 million was invested by

Plaintiff through Lakeview Investment, L.P. ("Lakeview"), which in turn invested these monies

with the Rye Fund.  Lakeview has assigned to Plaintiff its interest in the claims traceable to this

latter sum.  For purposes of this Complaint, all references to "Plaintiff" include Lakeview.

**Defendants**

### The Rye Defendants

14.     Defendant the Rye Fund is a Delaware limited partnership organized on or about

July 13, 2006.  The Rye Fund was a feeder fund into Madoff and/or BMIS, in that 100% of the

Fund's investment assets were entrusted to Madoff and/or BMIS as the Fund's outside

investment manager.

15.     Defendant Rye Investment Management is a division of Tremont Group

Holdings, Inc. (defined below).   Rye Investment Management manages Tremont Group

Holding's line of single manager investment products, specifically the Rye Fund.   "Single

manager investment products" means that the investment assets of the Rye Fund were managed

by one outside investment manager, specifically Madoff and BMIS.   Rye Investment

Management is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

### The Tremont Defendants

16.     Defendant Tremont Group Holdings, Inc. ("Tremont Group Holdings") is a

holding company for Tremont Partners, Inc., Tremont Capital Management and Rye Investment

Management. Tremont Group Holdings is located at 555 Theodore Fremd Avenue, Rye, New

York 10580.

17.     Defendant Tremont Partners, Inc. ("Tremont Partners") is the general partner of

the Fund.  Tremont Partners is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

As  general  partner,  Tremont  Partners  is  responsible  for  the  management  of  the  Fund's

investment activities, and has primary responsibility for monitoring the ongoing activities of the Fund's investment advisors and managers, including Madoff and/or BMIS. Tremont Partners is a wholly-owned subsidiary of Tremont Group Holdings. Tremont Partners is a registered investment adviser with the SEC, and as such Tremont Partners has a duty to act as a fiduciary and in its clients' best interests.

18.     Defendant Tremont Capital Management manages Tremont Group Holdings' family of multi-manager investment products, also known as a "FOF." A FOF, such as the Tremont family of funds (defined *infra* as the "Tremont Funds"), invests its assets with multiple outside investment managers. The Tremont Funds include: Tremont Arbitrage Fund, L.P.; Tremont Core Strategies Portfolio Ltd.; Tremont Emerging Markets Fund, L.P.; Tremont Enhanced Arbitrage Fund, L.P.; Tremont Enhanced Market Neutral Fund L.P.; Tremont Global Macro Fund, LLC; Tremont Long/Short Equity Fund, L.P.; Tremont Long/Short Equity Portfolio Limited Class B3; Tremont Long/Short Equity Portfolio Ltd.; Tremont Market Neutral Fund II, L.P.; Tremont Market Neutral Fund, L.P.; Tremont Oppenheimer Absolute Return Fund; Tremont Opportunity Fund II, L.P.; Tremont Opportunity Fund III, L.P.; Tremont Opportunity Fund, L.P.; Tremont Partners Inc./ADV; Tremont Partners Ltd.; Tremont Select Equities Fund; Tremont Select Equities Offshore ERISA Segregated Portfolio; Tremont Select Equities Offshore Segregated Portfolio; Tremont Select Funds; Tremont Select Special Situations ERISA Segregated Portfolio; Tremont Select Special Situations Fund; Tremont Select Special Situations Segregated Portfolio; Tremont Trading Fund, LLC; Tremont Value Recognition Fund, LLC; Various Rye Funds (via Spectrum Equities); Tremont Master Strategies Trust, which includes the following sub-Funds: Tremont Arbitrage Fund, Tremont Emerging Markets Fund, Tremont Equity Fund, Tremont Global Macro Fund, Tremont Japan Fund, Tremont Market Neutral

Investment Fund, Tremont Opportunity Investment Fund and Tremont Trading Fund, inclusive

of the following Registered Investment companies: Oppenheimer Funds Tremont Core Strategies

Hedge Fund, Oppenheimer Funds Tremont Market Neutral Hedge Fund, Oppenheimer Tremont

Market Neutral Fund, LLC, and Oppenheimer Tremont Opportunity Fund, LLC.

19.     As of December 2008, the Tremont Funds had collectively entrusted millions of

dollars of their assets to Madoff and/or BMIS either directly or through investments in the Rye

Fund.  On information and belief, some or all of the Tremont Funds entrusted assets to Madoff

and BMIS either directly or indirectly through the Rye Fund.

20.     Defendants Tremont Group Holdings, Inc., Rye Investment Management,

Tremont Partners, Inc., Tremont Capital Management Inc., and Tremont Funds are collectively

referred to herein as the "Corporate Tremont Defendants."

**The Individual Defendants**

21.     Defendant Robert Schulman ("Schulman") was president, Chief Executive

Officer, and Chairman of the Board of Tremont Group Holdings from 1994 to 2006.  In 2006,

Schulman was replaced as President of Tremont Group Holdings while continuing to serve as

Chief Executive Officer.  In June 2007, Schulman stepped aside as CEO of Tremont Group

Holdings and became President of Rye Investment Management while remaining Chairman of

Tremont Group Holdings.  Schulman retired in July 2008.  Prior to joining Tremont Group

holdings in 1994, Schulman was responsible for Smith Barney's $60 billion Consulting Services

Division and Retail New Product Development.  In 1982, Schulman founded the Leveraged

Product Division at E.F. Hutton and eventually assumed responsibility for all retail products

offered at E.F. Hutton.  Schulman resides in New York.

22.     Defendant Rupert Allan has been President of Tremont Group Holdings since 2006, and CEO since June 2007.  Allan has primary responsibility for the Tremont Capital Management fund of funds operations.

23.     Defendant Jim Mitchell is and has been president and Chief Executive Officer of Rye Investment Management since Schulman's retirement in July 2008.

24.     Defendants Schulman, Allan and Mitchell are collectively referred to herein as the "Individual Defendants," and together with the Corporate Tremont Defendants, the "Tremont Defendants."

25.     The Tremont Defendants, the Rye Fund, and the Tremont Funds are collectively referred to herein as the "Tremont-Fund Defendants."

**The Controlling Defendants**

26.     Defendant Oppenheimer Acquisition Corporation ("Oppenheimer") is a Delaware corporation and is the parent company of Tremont Group Holdings.  Oppenheimer acquired Tremont Group Holdings in 2001 (at the time, Tremont Group Holdings was known as Tremont Advisers, Inc.).  Oppenheimer's headquarters are located at 2 World Financial Center, New York, New York 10281.  Oppenheimer is also the parent of OppenheimerFunds, Inc. ("Oppenheimer Funds"), which is the manager of the well-known family of Oppenheimer mutual funds.

27.     Defendant Oppenheimer markets several funds with the Tremont Defendants, including the Oppenheimer Tremont Opportunity Fund, LLC and Oppenheimer Tremont Market Neutral Fund, LLC.  After its acquisition by Oppenheimer, Tremont Group Holdings marketed itself as "An OppenheimerFunds Company."

28.     Defendant MassMutual Holdings LLC ("MassMutual Holdings") is the parent company of Defendant Oppenheimer and its principal place of business is located at 1295 State Street, Springfield, Massachusetts 01111.

29.     Defendant Massachusetts Mutual Life Insurance Co. ("MassMutual") is the parent company of MassMutual Holdings.  Its headquarters are located at 1295 State Street, Springfield, Massachusetts 01111.  MassMutual is a mutually owned financial protection, accumulation and income management company and is a member of the Financial Industry Regulatory Authority ("FINRA") and the Securities Investor Protection Corporation ("SIPC").  MassMutual and its subsidiaries had more than $500 billion in assets under management at year-end 2007. MassMutual refers to itself, including its subsidiaries, such as the Oppenheimer Funds and the Corporate Tremont Defendants, as the "MassMutual Financial Group."

30.     Defendant MassMutual, as the parent company of Defendant Oppenheimer, and Oppenheimer, as the parent company of the Corporate Tremont Defendants, had the power to exercise complete control over the Tremont Defendants, including their selection and use of fund managers, their exercise of their professional responsibilities, and their marketing of funds through the use of offering materials.

31.     Defendants Oppenheimer, MassMutual Holdings, and MassMutual are collectively referred to herein as the "Controlling Defendants."

**The Auditor Defendant**

32.     Defendant KPMG LLP ("KPMG") is part of an international network of member firms offering audit, tax and advisory services and is one of the Big Four auditing firms.  KPMG is the U.S. member firm of KPMG International, a Swiss cooperative. KPMG maintains its U.S. headquarters at 757 Third Avenue, New York, New York 10017.  KPMG first audited the Rye

Fund's financial statements for the fiscal year ended December 31, 2005, and issued unqualified opinions thereon on March 6, 2006.  KPMG performed additional audits of the Rye Fund's financial statements for the fiscal years ended December 31, 2006 and December 31, 2007, and issued unqualified opinions thereon on March 26, 2007, and March 24, 2008, respectively.  As auditor of the Rye Fund, KPMG had a duty to perform its annual audits of the financial statements and financial condition of the Fund in accordance with professional standards applicable to those audits, described herein.

## SUBSTANTIVE ALLEGATIONS

### Summary of Allegations

33.     On March 12, 2009, Madoff pled guilty to all eleven counts in the criminal information filed by the United States Attorney's Office, admitting that he perpetrated a fraud since the early 1990s (prosecutors charged that the fraud began in the early 1980s).  In his plea allocution, Madoff admitted that he never invested his investment advisory clients' funds in securities, that he never employed the split-strike conversion strategy he (and the Tremont Defendants) touted, and that he never had custody of the securities he purportedly held for his investment advisory clients. (BMIS purportedly acted as prime broker and custodian for the assets Madoff claimed to manage for his investment advisory clients.)  Instead, Madoff and BMIS merely deposited client funds into an account at Chase Manhattan Bank, and distributed money from this account to clients who requested redemptions, while also appropriating some of those funds for his own use or other purposes.

34.     Madoff also admitted that he caused to be created and sent to his clients false trading confirmation and client account statements that reflected bogus transactions and positions.   These trade confirmations and account statements were designed to give the

appearance that he had executed his strategy with perfect market timing - buying stocks when they were towards the bottom of the price range for a given day, and selling close to the top. Prosecutors charged that Madoff hired numerous employees with little or no prior pertinent training or experience in the securities industry to perform these and other "back office" functions.  Madoff admitted that he knew that the audited financial statements he filed with the SEC were false and misleading; BMIS's accountant was thereafter charged with fraud on March 18, 2009.

35.     Madoff also described in his plea allocution how he wired money between BMIS's bank accounts and the London bank account of BMIS United Kingdom affiliate Madoff Securities International Ltd.  Prosecutors charged that these transfers were designed to give the appearance that he was conducting securities transactions in Europe.

36.     In order to keep the Ponzi scheme running, Madoff needed money from new investors.  Notwithstanding, Madoff limited the number of investors he would deal with directly. Consequently, Madoff accepted investments from funds sold by, among others, the Tremont Defendants.

37.     The Tremont-Fund Defendants marketed their funds such as the Rye Fund to investors like Plaintiff as a gateway to Madoff's investment advisory services, though, for the most part, they did so without disclosing that Madoff was the investment manager of their funds. The Tremont-Fund Defendants solicited investments into their funds pursuant to private placement memoranda and other materials from individuals, charities, pension funds and retirement accounts, institutions and other entities, including other hedge funds.  Tremont Partners served as the general partner of these limited partnerships and, as general partner,

retained Madoff to manage the limited partners' investments, even though they knew, or recklessly disregarded, that Madoff's investment operations involved improper conduct.

38.     As the general partner of the Rye Fund, the Tremont Partners and the Individual Defendants had fiduciary obligations to oversee the Rye Fund and ensure that the Fund's assets were invested in legitimate investment products.  In breach of their fiduciary duties, the Tremont Defendants raised billions of dollars for Madoff's improper operations and received hundreds of millions of dollars in improper fees, knowing, or recklessly disregarding, that Madoff was engaged in wrongful conduct with respect to the monies they placed under his management.  In particular, the Tremont Defendants placed over $3 billion of investor funds with Madoff and received annual management fees of 1% of each investor's investment and 0.5% for administration and auditing of Madoff's investment activity.  In 2008, the Tremont Defendants were in a position to generate over $50 million in illicit payments pursuant to their wrongful conduct.

39.     In marketing their funds to investors, the Tremont Defendants represented that one of their outside investment managers, *i.e.*, Madoff, had for years achieved, and was continuing to achieve, consistent annual returns in the range of 8-12% (with positive monthly returns in virtually every month) on the monies he was managing through a hedging strategy using equities, options trading, and short selling or so-called "split-strike conversion" strategy that entailed the purchase of 30 to 40 large capitalization S&P 500 stocks and the simultaneous sale of out-of-the-money calls on the S&P 100 Index and the purchase of out-of-the-money puts on the S&P 100 Index.  As explained by the New York Attorney General in its action against Ezra Merkin and others *(Cuomo v. Ezra Merkin & Gabriel Capital Corp.,* NY Supreme Ct., No. *0450879/2009,* the "NY AG Action"), Madoff would purportedly (a) buy stocks of selected

corporations that were included in the blue-chip S&P100 Index and simultaneously, (b) buy put options below the current stock price to protect against large declines, and (c) sell call options above the current price to fund the purchase of put options.  The call options would also, to some degree, limit any gains that would be earned on the underlying stocks.  Madoff claimed that under the right market conditions, he could achieve steady returns of over ten percent per year regardless of whether the market as a whole had advanced or declined.  The Tremont-Fund Defendants represented that through use of, among others, this strategy, the investment manager (*i.e.*, Madoff) could limit losses when stock prices decline while still affording an upside potential capped to the stock price of the short call when stock prices rise.

40.     As noted in the NY AG Action, Madoff's purported investment strategy evolved slightly over time.  Madoff soon began to claim that he was using a larger "basket" of stocks selected from the S&P Index, combined with put and call options on the S&P 100 Index itself rather than options on individual stocks.  The positions were supposedly held for a short period of time lasting from a few days to no longer than about two months, and then liquidated.  Madoff claimed to execute the "split strike conversion" strategy six to eight times per year.  At some point, Madoff purportedly adopted the practice of exiting the market entirely at the very end of each quarter and putting all funds in U.S. Treasury bills ("Treasuries").  For this reason, Madoff's quarterly statements to investors, and the end-of-year audits of investor holdings, would list only Treasuries.

41.     In fact, as noted, Madoff never executed this strategy. The court-appointed Trustee liquidating Madoff's assets has stated that he has found no evidence that, from at least 1996 to the present, any stocks or options were traded by Madoff for investors.

**Failure to Conduct Adequate Due Diligence**

42.     Hedge funds, like the Fund, are complex investment vehicles that, unlike mutual funds, are not subject to strict regulatory requirements for disclosure.  Their lack of transparency means that investors rely on fund managers to protect their investments by conducting thorough research and due diligence when selecting outside managers and continuing to conduct due diligence intermittently to ensure that the outside managers continue to meet the selection criteria.  The hedge fund managers also have a duty to closely monitor the performance of the underlying investments and to verify the information reported by the outside managers. Despite representing to prospective and existing investors that they were fulfilling their fiduciary duties by performing these functions, the Tremont Defendants conducted no or little due diligence, did not verify Madoff's and/or BMIS' reported results, and recklessly disregarded glaring warning signs that caused other industry professionals to steer clear of Madoff.

**Tremont Defendants Had a Long-Standing Relationship With Madoff**

43.     The Tremont Defendants, rather than conduct due diligence or, if conducted, proper due diligence of Madoff's operations, trusted his name and reputation based on a long-term relationship and years of generating fees.

44.     In or about May 1994, Defendant Schulman and Sandra L. Manzke ("Manzke") caused defendant Tremont Partners to form the Broad Market Fund, a hedge fund in the form of a limited partnership that solicited a pool of investments from individuals and entities. Defendant Tremont Partners served as the general partner of the Broad Market Fund and, pursuant to Manzke's, Schulman's, and Tremont Partners' arrangement with Madoff, placed all of the limited partners' investments with Madoff for his management.  Pursuant to their arrangement with Madoff, Tremont Partners paid Madoff commissions on his reported

investment transactions and charged each limited partner of the fund an annual percentage fee of 1% of the partner's investments for its "investment management" services on behalf of the fund, as well as a 0.5% administrative fee for purported record-keeping and auditing.

45.     According to the NY AG Action, at the time Manzke and Tremont Partners first recommended starting investing with Madoff, they knew or recklessly disregarded that Madoff purported to obtain his investment management success through the so-called "split-strike conversion" strategy described above.

46.     As noted, the Tremont Defendants knew, or recklessly disregarded, the fact that Madoff's purported split-strike strategy could not, in and of itself, produce the investment results claimed by Madoff.  In fact, as alleged, Madoff was engaging in no actual stock or option transactions, and his purported investment management strategy was a sham to conceal his implementation of a massive Ponzi scheme supported by massive infusions of investments from large investors and "feeder funds" like the Rye Fund, for example.

47.     Although the Tremont Defendants knew, or recklessly disregarded, that Madoff's investment returns were not actually produced by his purported split-strike conversion strategy, they falsely represented to the Plaintiff in written materials prepared, approved or distributed by defendant Schulman, and (after Schulman's retirement in 2008) Mitchell, that the performance history of the outside manager (i.e., Madoff) was produced by a hedging or split-strike conversion strategy.

48.     Although the Tremont Defendants knew, or recklessly disregarded, that Madoff's investment returns could not have been generated through the purported split-strike conversion strategy, they concealed that knowledge from Plaintiff and falsely represented to Plaintiff that the returns of the outside manager were honestly produced.

**Defendants Ignored Dozens of Warning Signs That**
**Madoff's Operations Were Not Legitimate**

49.     Defendants ignored myriad warning signs that Madoff was operating a fraud.  By failing to conduct due diligence on Madoff's operations, Defendants breached their fiduciary duties to Plaintiff and caused their statements regarding their ongoing due diligence and oversight of outside investment managers to be materially false and misleading.

50.     The numerous warnings signs, included, but are not limited to, the following:

    a.     <u>Suspect Strategy</u>: The description of Madoff's split-strike conversion strategy appeared to be inconsistent with the pattern of returns in the track record, which showed only seven small monthly losses over a 14 year period.  Moreover, the returns purportedly generated by this strategy could never be replicated by quantitative analysts who attempted to do so.  Michael Markov, a hedge fund consultant, stated that he was hired by a fund in 2006 to look into one of the feeder fund's returns and found that it was "statistically impossible to replicate them."   In May 1999, Harry Markopolos ("Markopolos"), a derivatives expert with experience managing the split-strike conversion strategy used by Madoff, sent a letter to the SEC describing how Madoff could not have generated the returns he reported using the split-strike conversion strategy.  As reported in May 2001, in an article titled, "Madoff Tops Charts; Skeptics Ask How," appearing in MAR/Hedge, a semi-monthly newsletter reporting on the hedge fund industry: "The best known entity using a similar strategy, a publicly traded mutual fund dating from 1978 called Gateway, has experienced far greater volatility and lower returns during the same period."

b.      <u>Suspect Market-Timing</u>: Account statements revealed a pattern of purchases at or close to daily lows and sales at or close to daily highs, which is virtually impossible to achieve with the consistency reflected in Madoff's reported results.

c.      <u>Impossible Options Volumes</u>: Trading volumes reflected in accounts were vastly in excess of actually reported trading volumes.  In particular, the S&P 100 Index options that Madoff purported to trade could not handle the size of the combined FOF assets.  A report from *Bloomberg* estimated that Madoff's strategy would have required at least 10 times the S&P 100 Index option contracts that traded on U.S. exchanges.

d.      <u>No Standalone Hedge Fund</u>: Madoff operated through managed accounts, rather than by setting up a hedge fund of his own, where his fees would have been much higher than the brokerage commissions he was charging.  This is particularly suspicious because a hedge fund requires annual audits.

e.      <u>Cash Positions</u>: BMIS liquidated its securities positions at the end of each quarter, presumably to avoid reporting large securities positions.  In 2007, hedge fund investment adviser Aksia LLC ("Aksia") urged its clients not to invest in Madoff feeder funds concluding, among other things, that, after reviewing Madoff's holdings, they were too small to support the size of the assets Madoff claimed to be managing.  Indeed, as noted, Irving Picard, the court-appointed trustee charged with sorting out what Madoff assets remain, reported that Madoff never engaged in any trades.

f.      <u>Lack of a Third Party Custodian and Administrator</u>: The FOF had administrators and auditors, but substantially all of the assets were in the custody of BMIS.  Moreover, BMIS initiated trades in the accounts, executed the trades, and served as custodian and administrator for the accounts.  Thus, instead of using an outside prime

broker as nearly all hedge funds do, Madoff was his own prime broker and custodian of all the assets he managed.  A December 13, 2008 article in *The Wall Street Journal* quoted Chris Addy, founder of Castle Hall Alternatives, which vets hedge funds for clients, as follows: "There was no independent custodian involved who could prove the existence of assets….  There's a clear and blatant conflict of interest with a manager using a related-party broker-dealer.  Madoff is enormously unusual in that this is not a structure I've seen."

g.      Obscure and Ill-Equipped Auditor: BMIS was audited by Friehling & Horowitz ("F&H"), which had three employees, of which one was 78 years old and living in Florida, one was a secretary, and the other was an active 47-year old accountant, whose office in Rockland County, New York was 13 feet by 18 feet. On March 18, 2009, David G. Friehling ("Friehling") was arrested and criminally charged with securities fraud and with aiding and abetting Madoff's Ponzi scheme.  The SEC also filed a civil complaint against Friehling and F&H, alleging that F&H never conducted even minimal audit procedures on Madoff and/or BMIS and failed to confirm that the securities BMIS purportedly held on behalf of its investors actually existed.

h.      Audit Reports: Audit reports of BMIS showed no evidence of customer activity whatsoever, with neither accounts payable nor accounts receivable from customers. BMIS appeared to be nothing more than a market maker - not a firm with $17 billion in customer accounts.

i.      Madoff Publicly Spoke of Secrecy: Madoff perpetuated the secrecy in his public statements.  As reported in the May 2001 article in MAR/Hedge, "[Madoff] won't reveal how much capital is required to be deployed at any given time to maintain the

strategy's return characteristics, but does say that 'the goal is to be 100% invested." Additionally, "[a]s for the specifics of how the firm manages risk and limits the market impact of moving so much capital in and out of positions, Madoff responds first by saying, 'I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk."  On May 7, 2001, *Barron's* published an article titled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum."  In that article, author Erin E. Arvedlund wrote: "When Barron's asked Madoff how he accomplishes this, he says, 'It's a proprietary strategy.  I can't go into it in great detail.'  'What Madoff told us was, 'If you invest with me, you must never tell anyone that you're invested with me.  It's no one's business what goes on here,' says an investment manager who took over a pool of assets that included an investment in a Madoff fund.  'When he couldn't explain to my satisfaction how they were up or down in a particular month,' he added, 'I pulled the money out.'"

j.     <u>Family Run Operation</u>: Key positions at BMIS were controlled by Madoff family members (Madoff's brother, two sons, and niece).

k.     <u>Lack of Electronic Access</u>: BMIS was supposedly technologically advanced but FOF did not have electronic access to their accounts at BMIS.  Paper documentation provided Madoff with the ability to manufacture trade tickets purporting to confirm investment results that had not and were not occurring, and to falsify supporting documentation.

**Investment Professionals Who Did Conduct Due Diligence**
**<u>Discovered the Red Flags Warning That Madoff Was Operating a Fraud</u>**

51.     The Tremont Defendants' selection of Madoff as an outside investment manager for the Rye Fund despite the abundance of red flags regarding Madoff and BMIS leads to only

one of three possibilities: (1) The Tremont Defendants conducted no due diligence whatsoever; (2) Defendants' due diligence was so recklessly deficient that they didn't discover the red flags, or (3) their due diligence uncovered these red flag warnings but these defendants ignored them. In their quest for larger fees whatever the case, the Tremont Defendants breached their fiduciary duties to Plaintiff.

52.     In the article "Madoff Tops Charts; Skeptics Ask How" appearing in the May 2001 MAR/Hedge (mentioned above), author Michael Ocrant wrote:

a.     "Madoff has reported positive returns for the last 11-plus years in assets managed on behalf of the feeder fund known as Fairfield Sentry…. [The] other [feeder] funds have demonstrated equally positive track records using the same strategy for much of that period."

b.     "Those who question the consistency of the returns…include current and former traders, other money managers, consultants, quantitative analysts and fund-of-funds executives, many of whom are familiar with the so-called split-strike conversion strategy used to manage the assets."

c.     These individuals "noted that others who use or have used the strategy…are known to have had nowhere near the same degree of success."

d.     "The best known entity using a similar strategy, a publicly traded mutual fund dating from 1978 called Gateway, has experienced far greater volatility and lower returns during the same period."

e.     "The strategy and trading, [Madoff] says, are done by signals from a proprietary 'black box' system that allows for human intervention to take into account the 'gut feel' of the firm's professionals."

     f.    "As for specifics of how the firm manages risk and limits the market impact of moving so much capital in and out of positions, Madoff responds first by saying, 'I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk.'"

     g.    "[Madoff] won't reveal how much capital is required to be deployed at any given time to maintain the strategy's return characteristics, but does say that 'the goal is to be 100% invested.'"

     h.    "Madoff, who believes that he deserves' some credibility as a trader for 40 years,' says: 'The strategy is the strategy and the returns are the returns.'  He suggests that those who believe there is something more to it and are seeking an answer beyond that are wasting their time."

53.    In the May 7, 2001, *Barron's* article, "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum," (mentioned above), Erin E. Arvedlund wrote:

     a.    The private accounts managed by Madoff "have produced compound average annual returns of 15% for more than a decade.  Remarkably, some of the larger, billion-dollar Madoff-run funds have never had a down year.  When Barron's asked Madoff…how he accomplishes this, he said, 'It's a proprietary strategy. I can't go into it in great detail.'  Nor were the firms that market Madoff's funds forthcoming…."

     b.    "Still, some on Wall Street remain skeptical about how Madoff achieves such stunning double-digit returns using options alone….  [T]hree option strategists at major investment banks told Barron's they couldn't understand how Madoff chums out such numbers [using this strategy]."

      c.     Adding further mystery to Madoff's motives is the fact that "he charges no fees for his money management services."

      d.     "The lessons of Long-Term Capital Management's collapse are that investors need, or should want, transparency in their money manager's investment strategy. But Madoff's investors rave about his performance - even though they don't understand how he does it.  'Even knowledgeable people can't really tell you what he's doing,' one very satisfied investor told Barron's.  'People who have all the trade confirmations and statements still can't define it very well.'….  This investor declined to be quoted by name.  Why?  Because Madoff politely requests that his investors not reveal that he runs their money."

      e.     "'What Madoff told us was, 'If you invest with me, you must never tell anyone that you're invested with me. It's no one's business what goes on here,' says an investment manager who took over a pool of assets that included an investment in a Madoff fund.  'When he couldn't explain how they were up or down in a particular month,' he added, 'I pulled the money out.'"

54.    In addition to the foregoing, on November 7, 2005, Harry Markopolos submitted a letter to the SEC, titled "The World's Largest Hedge Fund is a Fraud," in which he set forth in over 17 single-spaced pages and a two-page attachment, how Madoff's returns could not be real. Markopolos identified 29 red flags that were signs of highly suspicious activity in BMIS, including, among others:

      a.     "why would B[ernie] M[adoff] settle for charging only undisclosed commissions when he could earn standard hedge fund fees of 1% management fee + 20% of the profits?"

b.      "The third party hedge funds and fund of funds that market this hedge fund strategy that invests in BM don't name and aren't allowed to name Bernie Madoff as the actual manager in their performance summaries or marketing literature.…   Why the need for such secrecy?  If I was the world's largest hedge fund and had great returns, I'd want all the publicity I could garner and would want to appear as the world's largest hedge fund in all the industry rankings."

c.      "It is mathematically impossible for a strategy using index call options and index put options to have such a low correlation to the market where its returns are supposedly being generated from.  This makes no sense!  …However, BM's performance numbers show only 7 extremely small [monthly] losses during 14 ½ years and these numbers are too good to be true.  The largest one month loss was only -55 basis points (-0.55%) or just over one-half of one percent!  And BM never had more than a one month losing streak!"

d.      "Madoff does not allow outside performance audits."

e.      "Madoff's returns are not consistent with the one publicly traded option income fund with a history as long as Madoff's."

f.      "Why is Bernie Madoff borrowing money at an average rate of 16.00% per annum and allowing these third party hedge funds, fund of funds to pocket their 1% and 20% fees bases [sic] upon Bernie Madoff's hard work and brains?  Does this make any sense at all? Typically FOF's [funds of funds] charge only 1% and 10%, yet BM allows them the extra 10%.  Why?  And why do these third parties fail to mention Bernie Madoff in their marketing literature?  After all he's the manager, don't investors have a right to know who's managing their money?"

g.    "BM goes to 100% cash for every December 31st year-end according to one FOF invested with BM.  This allows for 'cleaner financial statements' according to this source.  Any unusual transfers or activity near a quarter-end or year-end is a red flag for fraud."

55.    As summed up by Markopolos: "If I was the world's largest hedge fund and had great returns, I'd want all the publicity I could garner and would want to appear as the world's largest hedge fund in all of the industry rankings.  Name one mutual fund company, Venture Capital firm, or LBO firm which doesn't brag about the size of their largest funds' assets under management.  Then ask yourself, why would the world's largest hedge fund manager be so secretive that he didn't even want his investors to know that he was investing their money?  Or is it that [Madoff] doesn't want the SEC and [the Financial Services Authority] to know that he exists?"

56.    In 2007, Aksia urged its clients not to invest in Madoff feeder funds after performing due diligence on Madoff and discovered several red flags, including:

a.    Madoff's comptroller was based in Bermuda, whereas most mainstream hedge funds have their own in-house comptrollers;

b.    Madoff's auditor, F&H, operated out of a 13 x 18 foot location in New City, New York, and included one partner in his late 70s who lives in Florida, a secretary, and one active accountant, whereas most hedge funds are audited by a Big Three accounting firm. F&H is now under investigation by the district attorney of Rockland County; and

c.    Aksia discovered the 2005 letter from Markopolos to the SEC described above.

57.     Aksia prepared its client advisory after, among other things, reviewing the stock holdings of BMIS that were reported in quarterly statements filed with the SEC.   Aksia concluded that the holdings appeared to be too small to support the size of the assets Madoff claimed to be managing.   The reason for this was revealed on December 15, 2008, when investigators working at Madoff's New York offices concluded that Madoff had been operating a secret, unregistered investment vehicle from his office.

58.     In addition to the foregoing, investment advisors and professionals, who thoroughly looked into Madoff's trading, were unable to reconcile investors' account statements with the reported returns.   In a December 13, 2008 article in *The New York Times,* Robert Rosenkranz, principal of hedge fund adviser Acorn Partners, was quoted as saying, "Our due diligence, which got into both account statements of [Madoff's] customers, and the audited statements of Madoff Securities, which he filed with the S.E.C., made it seem highly likely that the account statements themselves were just pieces of paper that were generated in connection with some sort of fraudulent activity."

59.     As noted earlier, Madoff was his own prime broker and custodian of all the assets he managed.   As Chris Addy told *The Wall Street Journal* on December 13, 2008, such conduct was unusual because without an independent custodian, there was no one "involved who could prove the existence of assets."   According to Addy, "There's a clear and blatant conflict of interest with a manager using a related-party broker-dealer."

60.     Had Defendants conducted due diligence into Madoff, BMIS, and/or Madoff-controlled entities, they would have discovered at least some of the dozens of red flags identified herein.   At the very least, like Aksia, Defendants should have been able to discover the existence

of Markopolos' letter, which would put them on notice of at least some of the red flags identified therein.

61.     Instead, Defendants relied on the "reputation" of Madoff without conducting any investigation of the *bona fides* of Madoff and his operations, and/or an analysis of the trading strategies and investment returns reported by Madoff, which remained consistently high even during adverse market conditions.

62.     Defendants acted with gross negligence and violated their duties by failing to perform, or cause to be performed, appropriate due diligence that would have revealed that the assets of the Fund (in whole or in part) were invested with Madoff, BMIS, and/or Madoff controlled entities and by failing to monitor the Fund investments in these Madoff entities.

### The Tremont Defendants Ignored the Red Flags Pointing Towards Madoff's Fraud Because Their Relationship With Madoff Benefited Them Financially

63.     The only rational explanation for the Tremont Defendants' failure to learn about, or their ignorance of, the myriad red flags identified above is that they were content to collect the fees they "earned" from their long-term relationship with Madoff and BMIS.  Therefore, they did not conduct due diligence that would have uncovered the red flags which would have required them to end their lucrative relationship with Madoff and/or the entities he owned and controlled.

64.     Notwithstanding their lack of candor and concern, the Tremont Defendants nevertheless gorged on fees.  The fees generated from the Tremont Funds illustrate this fact.  The Tremont Funds' investments in Madoff through the Rye Fund were particularly lucrative because Tremont Partners took two sets of fees.  This "double dip" also benefited Tremont Partners' ultimate owner, MassMutual.

65.     The first set of fees was taken from the Rye Fund.  This first set of fees was based on the imaginary asset values and investment returns reported by Madoff and accepted by

Tremont Partners.  Had their fees been calculated based on actual values, Tremont Partners would have been entitled to no fees from the Rye Fund.

66.     The second set of fees was taken directly from the Tremont Funds.  As related to Madoff, this second set of fees was again based on the imaginary asset values and investment returns that the Rye Fund reported by Madoff and passed along by Tremont Partners.  Had the fees been calculated based on actual values, Tremont Partners would have been entitled to nothing on account of investments in the Rye Fund.

### The Tremont Defendants' Assets Have Been Frozen Based In Part On An Investigator's Opinion That Tremont Should Have Discovered The Red Flags

67.     On March 20, 2009, a Connecticut Superior Court judge issued a temporary restraining order, freezing the assets of the Tremont Defendants in a case brought by the pension funds of the Connecticut town of Fairfield (CV 095023735) (the "Fairfield Action"). The plaintiffs in the Fairfield Action asserted claims under statutory and common law arising from the same facts and circumstances as alleged herein against Tremont Partners, Tremont Group Holdings, Oppenheimer Acquisition Corp., Manzke and Schulman, among others.

68.     In support of their motion for a temporary restraining order, the plaintiffs in the Fairfield Action submitted the affidavit of Edward H. Siedle (the "Siedle Aff.").  Siedle is a securities industry investigator with 25 years experience investigating non-traditional and alternative asset managers, including hedge funds.

69.     Siedle conducted an extensive investigation of the Tremont Defendants. Siedle's affidavit is exhaustive and his findings about certain Tremont Defendants here warrant quoting at length:

> Tremont Partners, and its principals, Manzke and Schulman…were all aware that Bernard L. Madoff was engaging in illegal conduct in connection with his purported money management operations and intentionally chose to participate in and support Madoff's

illegal conduct in order to reap enormous illicit financial benefits.... (Siedle Aff. ¶4).

Tremont principal Manzke, and Tremont investment professionals Suzanne Hammond and Catherine Sweeney (senior managers at the firm), all had substantial experience serving as fiduciaries to pension plans performing due diligence reviews of money managers as a result of their years of former employment at Rogers, Casey & Barksdale, Inc., a well-known, highly regarded pension fund consulting firm. Tremont principal Schulman, prior to his joining Tremont in 1994 as President and co-CEO, was Executive Vice President for Smith Barney where he headed up its $60 billion Consulting Services Division. Thus, Manzke and Schulman and their associates at Tremont were highly experienced in performing due diligence reviews of investment managers…. (Siedle Aff. ¶12(a)).

Critical to Madoff's purported investment strategy was the purchase and sale of put and call options on the billions of dollars of securities under his management. Given the enormous amount of the assets under management with Madoff purportedly invested in the strategy and the level of options trading required to implement the strategy, there were not enough listed and over-the-counter index options to support Madoff's level of trading. Further, the large volume of option trades that the strategy would have generated would have had a profound impact upon the market. **Market professionals purporting to review Madoff's trading activity — as the Tremont…professional[s]…represented they were carefully doing — would have been immediately aware of these fundamental disparities between what Madoff said he was doing and what the marketplace data showed (to the contrary). Likewise, it would be apparent to any market professional reviewing Madoff's purported trades that there is no evidence of the substantial block trades of the billions of dollars of securities in Madoff's purported strategy that would have been required. Further, press accounts indicate that even a cursory analysis of the stock trades reported on the account statements issued by Madoff compared against the actual trading prices on the relevant dates would have shown that the prices did not match. Quite clearly, it would be fundamentally apparent to any market professional performing due diligence on Madoff's trading activity that he was not trading the securities or options necessary to implement his purported split-strike conversion strategy….** (Siedle Aff. ¶12(f)) (emphasis added).

28

Any market professional would have been very troubled by the way in which Madoff purported to verify his purported trading activity.  Madoff's requirement that his investors custody their assets at BLMIS, as opposed to at a third party custodian, was unusual and posed real dangers, including lack of independent verification of assets within accounts and related returns. Moreover, the form of the BLMIS statements was outdated and lacking in detail, which was also both surprising and of concern from a verification standpoint.  Annual audits of Madoff s trading activities and holdings by a qualified, national auditing firm might have allayed these concerns; however, Madoff's auditor was a three-person firm which did not have the qualifications or expertise to audit an advisor with $17 billion in reported assets.  **While start-up companies sometimes use small auditing firms, it is unheard of for an established firm with billions under management to use such an auditor….**  (Siedle Aff. ¶12(f)) (emphasis added).

Other investment managers have noted inconsistencies between customer account statements and the audited BLMIS financial statements filed with the SEC. The stock holdings reported in the quarterly statements of BLMIS filed with the SEC appeared too small to support the size of the assets Madoff claimed to be managing.... (Siedle Aff. ¶12(f)).

The degree of secrecy insisted upon by Madoff was highly unusual and suspicious. While successful investment managers generally seek to tout their level of assets under management and their investment strategy and to be responsive to increasing demands for transparency, Madoff's refusal to provide information raised serious concerns with some cautious managers and advisors. (Siedle Aff. ¶12(f)).

The fee arrangement between Madoff and the "feeder firms" was the opposite of convention and counter-intuitive: Madoff, the investment fund manager who generated the exceptional returns, was paid a low commission-based fee, while the marketing firms received rich performance-like fees.  **Thus, Tremont, which charged over 1% for placing funds with Madoff, was scheduled to receive over $30 million in fees in 2008 on the $3.3 billion it had placed with Madoff….  All of these enormous fees were paid to the "feeder firms" for what was essentially marketing Madoff.  Madoff's willingness to part with such rich fees, which ordinarily would be retained by the investment manager, not the marketer, was a blatant "red flag." […]** (Siedle Aff. ¶12(f)) (emphasis added).

Such major financial institutions as Goldman Sachs, Merrill Lynch, Credit Suisse and Societe Generale were so uncomfortable with Madoff s refusal to provide a satisfactory explanation for his claimed success and the numerous red flags raising suspicions about the legality of his operations that they prohibited investments with Madoff.  Likewise, published reports document that a number of established financial advisors, including Aksia LLC, an independent hedge fund research and advisory firm, Acorn Advisory Capital, LP, an investment advisory firm, and others, refused to do business with Madoff for similar reason[s]…. (Siedle Aff. ¶14).

As a result of the substantial customer order flow at BLMIS, a plausible explanation for Madoff's superior investment performance in rising and declining markets was that Madoff was illegally "front-running" BLMIS's securities customers' orders. Indeed, this theory was discussed in the 2001 Barron's article referenced earlier, and FGG actually touted its "market-timing" ability as the basis for the returns it Madoff-invested hedge funds were obtained [sic].  (Siedle Aff. ¶22).

70.     Siedle summarized his conclusions on Tremont in a way that can only be called

damning:

Tremont Partners, thus, had a fiduciary and professional duty to the plaintiffs['] Plans in two respects - first, as general partner of the Rye Select hedge funds in which the Plans invested, and second, as the Plans' independent investment advisor.   In my opinion, Tremont Partners (and its principals) breached its fiduciary and professional duties to the plaintiffs['] Plans in both of these capacities.  Even if Tremont Partners (and its principals) did not actually know (or close their eyes to avoid knowing) that Madoff was involved in criminal activity, it was, in my opinion, a breach of Tremont Partners' fiduciary responsibility as the Plans' advisor and professionally negligent for Tremont Partners to fail to advise the Plans of the serious questions that existed concerning the legality of Madoff's investment activities and of the unsuitability of an investment of public pension funds with Madoff by the plaintiffs['] Plans.  Furthermore, if they did not actually know (or close their eyes to avoid knowing) that Madoff was involved in criminal activity, it was a breach of fiduciary duty and professionally negligent for Tremont Partners (and its principals) to fail to perform an adequate due diligence investigation of Madoff[']s investment activities to uncover such illegality or, at a

minimum, to determine that they were unable to verify Madoff's claimed returns.  (Siedle Aff. ¶23.)

71.    Based on the opinions in the Siedle Affidavit, the complaint in the Fairfield Case, and other affidavits, the judge issued a temporary restraining order freezing the assets of, among others, Tremont Partners, Tremont Group Holdings, Oppenheimer, Manzke, and Schulman.  The entry of a temporary restraining order is significant because it means that the court found that the plaintiffs in the Fairfield Action are likely to succeed on the merits.

**Defendants' False and Misleading Statements**

72.    Prior to investing in the Rye Fund, Plaintiff received and reviewed a Confidential Private Placement Memorandum regarding the Fund dated February 1, 2007 (the "PPM).  In discussing the investment objectives of the Fund, the PPM stated that the Fund "seeks to provide investors with long-term growth and a return linked to a three times levered exposure to the economic performance" of the Rye Select Broad Market Fund Fund, L.P., identified by the PPM as the "Reference Entity."  According to the PPM, the "Reference Entity [*i.e.*, the Broad Market Fund]…invest[s] the majority of the assets with one investment manager who employs a 'split strike conversion' strategy…."  Elsewhere, the PPM represents that the "Reference Entity is engaged in a diversified investment strategy concentrating primarily in securities through Managers, some of which may not be marketable."

73.    Although the PPM references the "split-strike conversion" strategy purportedly used by Madoff, the statements were nonetheless materially false and misleading because they conveyed the false impression that Tremont Partners was investing the Rye Fund's assets with an investment manager who was actually using this strategy.  In fact, as it is now well known, Madoff only claimed to use this strategy while operating a massive fraud.  Had Tremont Partners and the Individual Defendants conducted due diligence, or if conducted, appropriate due

diligence, they would have learned of the red flags identified herein relevant to the "split-strike conversion" strategy, that Madoff did not have such expertise, and that his investment advisory operation was nothing more than a fraud.  Furthermore, the PPM's reference to the purported purchase of "securities" was materially false and misleading since Madoff never purchased securities while engaging in his massive Ponzi scheme.

74.     In addition to the PPM, the Tremont Defendants disseminated fraudulent performance updates to Plaintiff regarding the Rye Fund.  During 2008, for example, the performance reports for the Rye Fund showed positive net returns for the year, even when the stock market was in a tailspin.  These returns were not real, as they were the result of Madoff's Ponzi scheme and, therefore, were materially false and misleading.

75.     The Tremont Defendants knew and intended that their communications to Plaintiff through documents, such as the performance updates, would create a false impression that the Fund's managers were being professionally vetted, monitored, and overseen by Tremont Partners.  The opposite, in fact, was true.

76.     Had the Tremont-Fund Defendants conducted due diligence into Madoff and BMIS, they would have discovered at least some of the dozens of red flags identified herein.  As discussed above, other investment professionals who did conduct proper due diligence discovered dozens of red flags and avoided investing with Madoff.

77.     Tremont Partners, as the general partner of the Fund (and the Individual Defendants who controlled Tremont Partners' day-to-day operations), failed to supervise and monitor the Fund's investments in violation of its fiduciary duties under the laws of both New York and Delaware, and contrary to the representations made in, among other documents, the PPM.

78.     According to Tremont Group Holding's website:

> ***Tremont has been at the forefront in setting the standard in the industry for fund of hedge funds investment management.*** Effective investment strategies and *oversight**, thorough manager research, careful due diligence**,* advanced risk allocation and time-tested portfolio management form the cornerstones of a comprehensive platform that has been refined over a 23-year span of dedicated strides to maximize our clients' objectives.   Our established performance history and our focus on client service distinguishes the firm at a time when the influx of new entrants creates choice but not the certainty of experience.   (Emphasis added).

79.     Similarly, in its Form ADV filed with the SEC on January 1, 2006, Tremont Partners represented that it "is engaged on a daily basis with custodians and/or trustees to monitor cash flow and fund compliance"; that "accounts are monitored in terms of securities holdings, asset mix and adherence to investment guidelines"; and that Tremont Partners "uses its own proprietary software programs to monitor the performance of investment managers."

80.     These statements were materially false and misleading because Tremont Partners conducted no due diligence or oversight with respect to Madoff and/or BMIS, failed to verify the existence of actual securities holdings, and failed to monitor Madoff's operations.

81.     Due to both (a) the success of the Tremont-Fund Defendants in affirmatively misrepresenting and/or omitting facts concerning the Fund's due diligence and in concealing material information about Madoff's phony strategies and investments, which they knew of and were obligated to disclose but failed to do so as set forth in the allegations above, and (b) Plaintiff's foreseeable and reasonable reliance upon Tremont Partners to honor its fiduciary duty of candor in communications to limited partners, Plaintiff did not and could not have reasonably discovered the wrongdoing alleged in any of the Counts set forth below, nor did it have sufficient true information to put it on reasonable notice of the wrongdoing alleged in any of the Counts set forth below until the Madoff Ponzi scheme was disclosed.

33

**Allegations Regarding the Controlling Defendants**

**Oppenheimer Acquires Tremont**

82.     In 2001, Oppenheimer acquired Defendant Tremont Advisers, Inc. ("Tremont Advisers") for $145.3 million.  Tremont Advisers is now known as Tremont Group Holding.  In the acquisition, shareholders of Tremont Advisers received $19 per share, which represented a significant premium over the price of Tremont Group Holdings' stock prior to the acquisition.

83.     As described in the Schedule 14A Proxy Statement filed by Tremont Advisers on August 20, 2001 soliciting votes in favor of the acquisition (the "Proxy Statement"), Oppenheimer "had been actively evaluating the alternative asset management industry and had discussed Tremont with representatives of Putnam Lovell" in the fourth quarter of 2000. Tremont Advisers later retained Putnam Advisors as its financial advisor on the deal.

84.     By the time of the acquisition, Tremont Advisers was an extremely profitable company.  Its total revenues from all sources had increased from $10,656,100 in 1998, to $16,524,600 in 1999, to $23,177,500 in 2000.

85.     According to Tremont Advisers' Form 10-KSB for 2000 ("2000 10-K"), more than half of Tremont Advisers' revenues came from the fees it collected on its proprietary funds. In 2000, Tremont Advisers' revenues from its funds totaled $11,874,400, representing 51.2% of Tremont Advisers' total revenues.  Moreover, its fund revenues had increased dramatically between 1998 and 2000. According to the 2000 10-K, "[f]ees from the Company's proprietary investment funds increased 45.9% from $8,139,500 in the year ended December 31, 1999 to $11,874,400 for the year ended December 31,2000 and 67.6% from $4,855,600 in the year ended December 31, 1998 to $8,139,500 for the year ended December 31, 1999, in both cases due to

the growth of the funds' net assets caused by additional investor capital contributions and positive investment performance."

86.     Tremont Advisers attributed the success of its funds to the managers it selected to invest fund assets.   Indeed, according to the 2000 10-K, Tremont Advisers' "proprietary investment funds were originally created to provide clients with vehicles for investment with 'hard-to-access managers."   The 2000 10-K also stated that: "Tremont's single-manager funds offer access to managers who have undergone review by the Company's research department and investment committee.   The Company sponsors only the funds of those managers it believes to be the 'best in class,' who generally have at least a 12 month track record and $50 million under management."   Tremont Advisers' "hard-to-access" and "best in class" manager was Madoff.

87.     According to the Proxy Statement, in early March 2001, Oppenheimer approached Putnam Lovell and expressed interest in exploring a potential strategic transaction with Tremont Advisers.   After discussions between high level executives of both companies, including Manzke and Schulman for Tremont Advisers, Oppenheimer and Tremont Advisers decided to continue their discussions, and, on March 14,2001, entered into a confidentiality agreement.   Putnam Lovell then provided Oppenheimer with a due diligence packet it had assembled on Tremont Advisers, which included "a description of Tremont's various business lines, an overview of its investments and distribution platform, its strategic relationships, its distribution needs and its financial projections."

88.     Oppenheimer was also given access to Tremont Advisers' "data room" which, according to the Proxy Statement, "housed an extensive list of Tremont due diligence material including legal contracts, corporate documents, regulatory filings, audited and unaudited

financial statements."   Oppenheimer then conducted extensive due diligence on Tremont Advisers, including its funds, its fund managers, and its due diligence procedures.

89.    According to the Proxy Statement, as part of Oppenheimer's due diligence, Tremont Advisers provided to Oppenheimer "true, correct and complete copies of the offering documents, subscription agreements, administrative services agreements, distribution or placement agency agreements, solicitation agreements and custody agreements, as applicable, or any similar agreements, in any case pertaining to the Funds and used since January 1, 1998."

90.    Tremont Advisers also "agreed to afford to Oppenheimer and its representatives reasonable and prompt access to our information, assets and personnel and to make available to Oppenheimer on a timely basis a copy of each material document filed, furnished or received by us pursuant to the requirements of domestic or foreign laws and all other information reasonably requested by Oppenheimer concerning our business, properties and personnel."

91.    Indeed, in the proxy statement Tremont Advisers represented and warranted that it had provided Oppenheimer with "each Company Contract between the Company, any of its Subsidiaries or any of the Funds and any other Person…in which the Company, any of its Subsidiaries or any of the Funds owns an equity interest," and "each other Company Contract material to the business, governance, operations or financial condition of the Company, any of its Subsidiaries or any of the Funds."   Any contract between Tremont Advisers and Madoff or BMIS, therefore, would have been analyzed by Oppenheimer during due diligence.

92.    As part of its due diligence, Oppenheimer also had various meetings with Tremont Advisers personnel, including Manzke and Schulman, which, according to the Proxy Statement, "focused on various business function areas, such as sales and marketing, accounting and administration and manager research."   Thus, Oppenheimer had full access to all information

pertaining to Tremont Advisers' "strategic relationships," due diligence on the investment managers of its funds, and the due diligence procedures Tremont Advisers employed.

93.     Oppenheimer's due diligence continued for three months until mid-June 2001. As a result of its extensive due diligence, Oppenheimer would have discovered that Tremont Advisers' "hard-to-access" and "best in class" manager was Madoff. Oppenheimer also would have discovered that the robust revenue stream Tremont Advisers derived from its funds was largely due to its retention of Madoff.

94.     Indeed, Putnam Lovell, which had numerous meetings and discussions with Oppenheimer executives during the due diligence process, in analyzing the financial fairness of the merger, considered "the significant contribution to Tremont's revenues from a single relationship it has with an investment manager to its proprietary investment products." Therefore, Oppenheimer knew that if it acquired Tremont Advisers, it was acquiring the latter's extremely lucrative "single relationship" with Madoff.

95.     On July 10, 2001, Oppenheimer and Tremont Advisers entered into the Merger Agreement pursuant to which Oppenheimer acquired Tremont Advisers for $145.3 million. The purchase price represented over thirty-six times Tremont Advisers' net income in 2000, and ten times Tremont Advisers' pro forma balance sheet. Oppenheimer financed the transaction using cash on hand, and, if necessary, capital contributions by Oppenheimer's parent MassMutual.

96.     As part of the merger, Oppenheimer's subsidiary, OppenheimerFunds, entered into employment agreements with Manzke and Schulman, the Co-Chief Executive Officers of Tremont Advisers, whereby Manzke and Schulman would retain their positions for five years following the merger.

97.     Under their respective employment agreements, Manzke and Schulman were to receive annual salaries of $500,000 each and would be eligible for annual discretionary bonuses of up to 150% of their base salaries, but no less than the lower of $500,000 or 20% of a bonus pool.  The bonus pool was to consist of up to 22.5% of the annual EBITDA of Tremont Advisers for 2002 and beyond.  Oppenheimer was willing to pay Manzke and Schulman these amounts because they had the relationship with Madoff, and Oppenheimer wanted to make sure their relationship would continue after it acquired Tremont Advisers.  In fact, one of the conditions under which Oppenheimer could terminate the merger was if these employment agreements with Manzke and Schulman were not in effect at the time of the closing of the merger.

98.     Oppenheimer hoped to profit from its acquisition of Tremont Advisers by making its funds widely available to the investing public.  In a July 10, 2001 press release announcing the merger, John V. Murpy, then Chairman and CEO of Oppenheimer Funds, stated "Tremont's unique product offerings, in combination with our distribution network, will open up the world of alternative investing to a new segment of investors."

99.     In its press release announcing the merger, Tremont Advisers also touted the benefits of Oppenheimer's distribution network to increasing the availability of Tremont Advisers' funds.  In this regard, Schulman stated, "[o]ur alliance with OppenheimerFunds is an excellent strategic fit that brings together Tremont's capabilities in creating alternative investment products with Oppenheimer's strong financial intermediary relationships and unparalleled distribution talents."

100.    Oppenheimer's acquisition of Tremont Advisers and its funds allowed Oppenheimer to fill a gap in its product line and generate greater profits by making the funds available to a larger pool of investors.  As Kurt Wolfgruber, the Director of Domestic Equities at

Oppenheimer Funds, was quoted as saying in a July 11, 2001 article in *The New York Times:* "Tremont fits perfectly with our goal of extending both our product line and our client base," adding that "[o]ur clients have been asking for hedge funds more frequently."

101.    Similarly, in a July 10, 2001 Press Release about the merger in *The Financial Times,* John V. Murphy, then Chairman and CEO of Oppenheimer Funds, was quoted as saying: "We believe Tremont's multi-manager, fund-of-funds approach to hedge fund investing will appeal to many of our-high-net-worth-shareholders."

102.    The merger was consummated in October 2001. Following the merger, Tremont Advisers marketed itself as "An OppenheimerFunds Company."

103.    Further, Tremont Advisers emphasized its connection to Oppenheimer and MassMutual in its marketing materials.  In describing its privacy policy in its private placement memoranda for its funds, Tremont Advisers stated:

> Tremont is made up of certain entities, including its investment advisory and broker-dealer subsidiaries, and, in turn, is part of a larger corporate affiliation owned by the OppenheimerFunds group and Massachusetts Mutual Life Insurance Company.  The Tremont entities and, in some cases, its ownership affiliates often work together to provide the financial products and services offered to Tremont Clients.  By sharing information about Tremont's Clients among these companies and affiliates, Tremont can serve Clients more efficiently.  Tremont is permitted to share information concerning Client account history and experiences within and among the companies that comprise Tremont and its subsidiaries and affiliates.

**MassMutual Represented Itself, Oppenheimer and Tremont Group Holdings As Being Part of One Integrated Financial Services Company**

104.    MassMutual markets itself and its subsidiaries, such as Oppenheimer Funds and Tremont Group Holdings, as one integrated financial services company under the name the "MassMutual Financial Group."  MassMutual's annual reports include discussions of its life

insurance, mutual fund and asset management businesses, among others, and its consolidated financial statements report results from each of these businesses.

105.    MassMutual's annual reports for 2005, 2006, and 2007 state that "Massachusetts Mutual Life Insurance Company and its subsidiaries have offices around the globe," and list and provide contact information for "OppenheimerFunds, Inc., Tremont Group Holdings, Inc. and Tremont Capital Management Ltd."   The three subsidiaries are identified as "general agencies and other offices."

106.    In describing its "Corporate Operations" in its 2005 Annual Report, MassMutual refers to itself as a "diversified financial services organization" and states that: "When leveraged across the enterprise, [our] resources help us increase efficiencies and take advantage of economies of scale, ensuring that people in our lines of business can focus on their primary objective: to develop, distribute and service a wide variety of financial products to help our customers meet their needs."

107.    In its 2005 Annual Report, Mass Mutual also touted the strength of its asset management business, which includes Oppenheimer Funds and Tremont Group Holdings, writing: "The MassMutual Financial Group companies have the experience and disciplined financial expertise required by today's sophisticated individual, corporate and institutional investors.   From $325.8 billion in 2004 to $395.9 billion as of year-end 2005, assets under management at our companies, including OppenheimerFunds, Inc…increased more than 22 percent.  This reflects the confidence investors have in our asset management capabilities."

108.    In the 2005 Annual Report, MassMutual singled out the success of its subsidiaries that are "funds of funds" such as the Tremont Funds: "Similarly, the company's businesses serving affluent investors continued to grow, expanding offerings and gaining traction in key

products such as hedge funds of funds, separately managed accounts and college savings plans. As a result, these businesses now collectively manage over $8.5 billion in assets, with sales up 15 percent over last year." The Annual Report further noted that: "In late 2005, OppenheimerFunds, along with its subsidiaries and controlled affiliates, reached a significant milestone, surpassing $200 billion in assets under management."

109. Similarly, in its 2006 Annual Report, MassMutual reported that Oppenheimer Funds and its controlled affiliates:

> have helped investors realize their financial goals by offering diverse investment products, strong long-term investment performance and excellent customer service. The company's consistent focus on long-term investing, building lasting partnerships with financial advisors and maintaining a values-based culture is the foundation of its success and the springboard for its continued growth.
>
> Each of the company's business lines—serving retail and institutional clients—experienced significant growth in 2006. Sales for the company totaled $59.7 billion, up 29 percent over 2005; assets under management were $244.1 billion at year-end 2006, a 19.5 percent increase over the previous year. This marks the company's fourth consecutive year of record results.

110. In its 2007 Annual Report, MassMutual stated that Oppenheimer Funds is "[o]ne of the nation's largest and most respected investment management companies, [and] OppenheimerFunds has been helping investors realize their financial goals for nearly a half century. OppenheimerFunds and its controlled affiliates offer a broad range of products and services."

111. The 2007 MassMutual Annual Report also emphasized the interconnected relationships among MassMutual and its investment subsidiaries and that such relationships enhanced MassMutual's overall financial strength and stability: "The MassMutual Financial Group of companies includes a number of respected investment management companies. If you

have an insurance policy or retirement plan with us, your money is often managed by these industry leaders.  Or, they can serve you and other investors independently.  Their presence in the MassMutual Financial Group enhances our overall financial strength and stability."

112.    In addition, according to its 2007 Annual Report, MassMutual has agreements with its affiliates, such as Oppenheimer Funds, to provide record-keeping and other services.  As of December 31, 2007, these affiliates owed MassMutual $17 million.

113.    MassMutual also acknowledged the role its subsidiaries, such as Oppenheimer Funds and Tremont Group Holdings, played in its overall success as a company.  In a 2008 MassMutual publication entitled "The Keys to Investment Management," MassMutual states: "Our investment management expertise, which is integral to the success of our company and products, is drawn from our investment subsidiaries."   These investment subsidiaries include Oppenheimer Funds and Tremont Group Holdings.

114.    In its 2008 Annual Report, MassMutual referred to Oppenheimer Funds as "[o]ne of the nation's largest and most respected investment managements companies," and reiterated that Oppenheimer Funds and "its controlled affiliates offer a broad range of products and services to individuals, corporations and institutions."

115.    In addition, Manzke and Schulman, who were hired as executives of Oppenheimer Funds as part of the merger, enjoyed the same benefits as other Oppenheimer Funds executives.  According to the Proxy Statement, Manzke and Schulman would "receive employee benefits on the same basis as other similarly situated Oppenheimer Funds [OppenheimerFunds, Inc.] executives," and participate in a bonus pool established for Tremont Group Holdings that was "consistent with Oppenheimer's overall bonus arrangements."  Under their respective employment agreements, Manzke and Schulman had the right to terminate their

employment if among other things, there was "a material diminution of the level of the executive's title and reporting position to the board of directors of Tremont Group Holdings, Oppenheimer Funds or Oppenheimer from those in effect immediately following the completion of the merger."

116.    After the acquisition of Tremont Group Holdings, MassMutual operated and marketed itself as a single, integrated financial services company comprised of its life insurance business and its investment subsidiaries such as Oppenheimer Funds and Tremont Group. Holdings.  MassMutual therefore controlled Tremont Group Holdings and is chargeable for Tremont Group Holdings' false statements and material omissions in the Funds' private placement memoranda, the ongoing false statements and material omissions in other communications, and Tremont Group Holdings' failure to discharge its professional duties in a manner consistent with its fiduciary obligations.

### MassMutual and Oppenheimer Controlled Tremont

117.    MassMutual, through its control of Oppenheimer, controlled Tremont Group Holdings.

118.    Oppenheimer is a majority-owned subsidiary of MassMutual Holdings Trust I ("MassMutual Trust"), a Massachusetts business trust, which is controlled by MassMutual Holdings Company, a Delaware corporation ("MassMutual Holdings").  MassMutual Holdings, in turn, is controlled by MassMutual.

119.    MassMutual appointed its own employees on the boards of Oppenheimer and MassMutual Trust, both of which it controlled.  For example, after Oppenheimer acquired Tremont Group Holdings, the following MassMutual employees were members of the board of directors of both Oppenheimer and MassMutual Trust: Howard E. Gunton, Executive Vice

43

President and Chief Financial Officer of MassMutual; Stuart H. Reese, Executive Vice President and Chief Investment Officer of MassMutual; John V. Murphy, Executive Vice President of MassMutual; Lawrence W. Burkett, Jr., Executive Vice President and General Counsel of MassMutual; and Ann F. Lomeli, Senior Vice President, Secretary and Deputy General Counsel for MassMutual.

120.    MassMutual's majority stock ownership of Oppenheimer and its installment of its own officers in high level executive positions at Oppenheimer gave MassMutual control over all aspects of Oppenheimer and Oppenheimer's subsidiaries, including Oppenheimer Funds and Tremont Group Holdings.

121.    Further, MassMutual and Oppenheimer executives controlled Tremont Group Holdings as directors.

122.    John V. Murphy, was a director of Tremont Capital from 2001-2009, the President and a director of Oppenheimer from 2001-2009, Chairman, President and Chief Executive Officer of Oppenheimer Funds from 2001-2008, the Chairman of Oppenheimer Funds in 2009, and Executive Vice President of MassMutual from 2001-2009.

123.    Michael T. Rollins was a director of Tremont Group Holdings in 2007, Senior Vice President of MassMutual in 2005, and Executive Vice President and Chief Financial Officer of MassMutual from 2006-2009.

124.    Kurt Wolfgruber was a director of Tremont Capital from 2003-2009, the Director of Domestic Equities of Oppenheimer Funds from 2001-2003, Chief Investment Officer of Oppenheimer Funds from 2003-2007, and Chief Investment Officer and President of Oppenheimer Funds from 2007-2009.

125.    In addition, individuals employed by or affiliated with MassMutual and Oppenheimer controlled the board of directors of hedge funds that were advised by Oppenheimer Funds and sub-advised by Tremont Partners.  For example, according to the Annual Report of the Tremont Core Strategies Fund, the fund had one insider trustee, John V. Murphy, who was the President and Principal Executive Officer of the Fund, and also the President of Oppenheimer, Chairman of Oppenheimer Funds and Executive Vice President of MassMutual. While the other ten trustees of the fund were characterized as independent trustees, all of them had an affiliation with Oppenheimer Funds as overseers of other portfolios in the Oppenheimer Funds complex. Brian F. Wruble and David K. Downes each oversaw portfolios of 64 Oppenheimer Funds funds, and the following trustees oversaw 54 Oppenheimer Funds funds: Matthew P. Fink, Robert G. Galli, Phillip A. Griffiths, Mary F. Miller, Joel W. Motley, Russell S. Reynolds, Jr., Joseph W. Wikler and Peter I. Wold.

**Oppenheimer Funds, as the Advisor to the Oppenheimer Tremont Funds, Knew or Should Have Known Tremont Invested Fund Assets With Madoff**

126.    Following the merger, MassMutual and Oppenheimer established, among others, the Oppenheimer Tremont Market Neutral Fund, LLC ("Oppenheimer Tremont MNF") and the Oppenheimer Tremont Opportunity Fund, LLC ("Oppenheimer Tremont Opportunity"). According to their prospectuses, Oppenheimer Funds was the investment adviser and Tremont Partners was the investment manager of the funds, subject to supervision by Oppenheimer Funds.

127.    As investment adviser to the funds, Oppenheimer Funds, subject to the ultimate supervision of and subject to any policies established by the fund's board, was "…responsible for developing, implementing and supervising the Fund's investment program and for providing

various administrative services to the Fund…."  Oppenheimer Funds therefore had access to Tremont's Funds' investments and had knowledge of Tremont Partners' use of Madoff.

128.    Pursuant to the Oppenheimer Tremont MNF and Oppenheimer Tremont Opportunity's prospectuses, Manzke and Schulman were part of the management team of the funds, and were "primarily responsible for selecting Portfolio Managers and allocating the Fund's assets among the Portfolio Managers."

129.    Oppenheimer Tremont MNF and Oppenheimer Tremont Opportunity each had an eight member Board of Managers, the function of which, according to their Statement of Additional Information, was to "manage and control the business affairs of the Fund, including the complete and exclusive authority to establish policies regarding the management, conduct and operation of the Fund's business."  Of the eight members of the Board of Managers of the funds, six had affiliations with either MassMutual or Oppenheimer.

130.    Due to its exposure to Madoff's Ponzi scheme, Oppenheimer closed the Oppenheimer Tremont MNF as of March 25, 2009.

131.    On March 31, 2009, in the wake of the collapse of the funds, Kurt Wolfgruber, who was a director of Tremont Capital, "resigned" from his position as Oppenheimer Funds' Chief Investment Officer, no doubt as a result of the Oppenheimer Tremont funds' exposure to Madoff on his watch. Wolfgruber's resignation was announced in a press release issued by Oppenheimer Funds, which announced in the same press release that Oppenheimer Funds was making additional staffing & changes to "enhance its risk management capabilities" to assure its clients and the investment public that its risk monitoring procedure would not expose its clients to unscrupulous investment managers like Madoff in the future.

**Allegations Regarding KPMG**

132.    KPMG was engaged to perform audits of the Fund's financial statements.  These audits were to be performed in accordance with Generally Accepted Auditing Standards ("GAAS"), established by the Accounting Standards Board ("ASB") of the American Institute of Certified Public Accountants ("AICPA").

**GAAS Requirements**

133.    GAAS fall into three basic categories: General Standards, Fieldwork Standards, and Reporting Standards.  The General Standards provide guidance to the auditor on the exercise of due professional care.  The Standards of Fieldwork provide guidance on audit planning, proper evaluation of internal controls, and the collection of evidential matter sufficient to allow the auditor a reasonable basis for rendering an opinion regarding the financial statements under audit.  The Standards of Reporting provide guidance to the auditor on the content of the audit report and the auditor's responsibility contained therein.  AU 150.02.

134.    GAAS required KPMG to exercise due professional care in the performance of its audits and the preparation of its reports.  (AU §§150.02, 230.02.)  Due professional care required KPMG to exercise professional skepticism, an attitude that includes a questioning mind and a critical assessment of audit evidence.  (AU §230.07.)

135.    GAAS required KPMG to obtain a sufficient understanding of the Rye Fund and its environment, including its internal controls, in order to assess the risk of material misstatement of the Fund's financial statements, whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures. (AU §150.02.)

136.    As part of the process of obtaining an understanding of the Rye Fund and its environment, KPMG was required to obtain an understanding of, among other things, the hedge

fund industry in general, and, in particular, the nature of the Fund and the objectives, strategies, and related business risks that may result in a material misstatement in the financial statements of the Fund. This included obtaining an understanding of the Fund's operations, ownership, governance, structure, how it was financed, and the types of investments it made. (AU §§314.21, 314.26.)

137.    As part of the process of obtaining an understanding of the Fund's internal controls, GAAS required KPMG to evaluate the design of those controls, and determine whether they had been implemented. (AU §314.40.)   Additionally, if KPMG planned to rely on the internal controls of the Fund, GAAS required KPMG to determine that these controls were operating effectively.  (AU §§318.13, 318.23, 318.24, 318.45.)  "Internal control is a process - effected by those charged with governance, management, and other personnel- designed to provide reasonable assurance about the achievement of the entity's objectives with regard to reliability of financial reporting, effectiveness and efficiency of operations, and compliance with applicable laws and regulations."  (AU §314.41.)

138.    GAAS recognizes that an understanding of an entity and its environment, including its internal controls, does not provide by itself a sufficient basis for forming an opinion on an entity's financial statements.  Rather, GAAS requires the auditor to perform further audit procedures.   (AU §150.02.) Further audit procedures include "tests of controls" and/or "substantive procedures."

139.    Tests of controls are used to "obtain audit evidence that controls operate effectively.  This includes obtaining audit evidence about how controls were applied at relevant times during the period under audit, the consistency with which they were applied, and by whom or by what means they were applied."  (AU §318.26.)  Substantive procedures are performed to

detect material misstatements, and primarily include tests of details of balance sheet and income statement accounts, and of analytical procedures.  (AU §318.50.)

140.    Because effective internal controls generally reduce, but do not eliminate, the risk of material misstatement, and because an auditor's assessment of risk is judgmental and may not be sufficiently precise to identify all risks of material misstatement, tests of controls reduce, but do not eliminate, the need for substantive procedures.  (AU §§318.09, 318.51.)  Therefore, GAAS requires KPMG to design and perform substantive procedures for the Fund's material balance sheet and income statement accounts - such as the Fund's investments and investment income.  More specifically, KPMG was were required to test (i) the existence and valuation of the Fund's securities at every balance sheet date; (ii) the Fund's ownership of those securities; (iii) the occurrence and accuracy of the Fund's transactions in U.S. Treasury obligations, stocks, and options; and (iv) the reasonableness of the Fund's reported investment income.  (AU §§318.09, 318.51, 326.15, 332.21-22, 332.25.)

141.    KPMG knew or recklessly disregarded that Tremont Partners (as general partner of the Fund) engaged Madoff and/or BMIS to perform the functions of investment advisor, prime broker, and custodian of the Fund's investments.

142.    This concentration of functions at BMIS created risks requiring special audit consideration - what GAAS calls "significant risks."  (AU §314.110.)  Because primarily all the Fund's investment and income information available to KPMG was based on information from Madoff and/or BMIS, KPMG needed to do more than rely solely on the procedures it performed with respect to the Fund.  (AU §§314.115, 318.53, 332.20.)  In these circumstances, KPMG should have determined whether an auditor conducted adequate procedures to satisfy itself of the

effectiveness of BMIS's internal controls (AU §§332.18, 332.20), and the existence of assets and the occurrence of trades reported by BMIS.

143. In view of this concentration of functions at BMIS, among other red flags, KPMG should have obtained additional audit evidence relating to the effectiveness of the functions performed by BMIS relevant to the Fund's reported investments and investment income. (AU §332.18, 332.20.)

144. For example, KPMG should have obtained additional audit evidence about the operating effectiveness of those controls relating to initiation, recording, processing, and reporting of BMIS's investment advisory clients' transactions (including those of the Fund), and those relating to the custody of BMIS's investment advisory clients' investments (including those of the Fund). (AU §§318.25, 332.18, 332.20.)

145. In addition, AICPA publication, "Alternative Investments - Audit Considerations, A Practice Aid for Auditors", which was intended to assist auditors in their audits of hedge funds and funds of funds, provides that the extent of the audit evidence necessary to conclude on the sufficiency and the appropriateness of audit evidence increases as: (1) the percentage of alternative investments to both the total assets, as well as the total investment portfolio increases; and (2) the nature, complexity and volatility of the underlying investments increases. Here, because the investments in BMIS accounted for the vast majority of the Fund's assets and BMIS's operations were opaque, this should have alerted KPMG that the highest level of audit evidence would be required in order to opine on the Fund's financial statements.

146. Under these circumstances, KPMG should have taken additional steps to verify the Fund's investments with BMIS, including, inter alia: observing the Fund's visits and telephone calls with BMIS; inspecting other documentation showing the Fund's investments

with BMIS; and reviewing periodic statements from BMIS reflecting the investment activity and comparing that activity with amounts recorded by the Fund.

### KPMG Acted Improperly

147.    For the reasons described below, KPMG could not have obtained sufficient audit evidence about the operating effectiveness of controls at BMIS, or reasonably have satisfied itself about the existence of the investments and the reasonableness of the reported investment income by performing substantive audit procedures.  Nevertheless, KPMG recklessly issued unqualified audit opinions on the Fund's financial statements.

148.    In view of the unreliability of the audit evidence, as described above, KPMG could not have issued unqualified audit opinions on the Fund's financial statements unless additional audit procedures were performed, the results of which reasonably satisfied KPMG that the reported securities existed and the reported investment income was reasonably stated.  If these required procedures could not be performed, then GAAS required that KPMG disclaim an opinion on the Fund's financial statements.  (AU §508.62.)

149.    Moreover, KPMG failed to consider in doing their audits that the Fund did not have sufficient internal controls for evaluating the veracity of the financial returns that Madoff reported to the Fund.  The Fund was unable or unwilling to analyze the financial returns claimed by Madoff, or the data available to the Fund to conduct such an analysis.  Since the financial returns that Madoff reported were routinely fabricated, it is apparent that KPMG failed to determine and consider that no analysis was done by the Fund.  Nevertheless, KPMG opined that the financial statements of the Fund presented fairly in all material respects the financial position and results of operations of the Fund.

150.    Further, in auditing the financial statements for the Fund, KPMG knowingly or recklessly disregarded numerous red flags, including: (i) that the Fund's investments were heavily concentrated in a single manager, Madoff; (ii) that Madoff's purported trading strategy and returns were unable to be replicated by others in the financial industry and were consistently achieved despite the performance of the overall financial market; (iii) that Madoff did not employ any third party administrators and custodians; Madoff instead ran his own back office operations - *i.e.*, the calculation of net asset values, and the preparation of account statements, etc.; (iv) that the Fund relied solely on Madoff to provide it with reports on the performance of the Fund's investments; (v) that there was a discrepancy between the trading activity in which Madoff claimed to be buying and selling puts and calls and the open interest of index option contracts; (vi) that Madoff lacked transparency and limited access to his books and records; (vii) that Madoff later admitted to illegally manipulating his accounting records by personally subsidizing returns in slow quarters in order to minimize risk and to maximize reported performance; and (viii) that BMIS was audited by a small operation, as opposed to the 90% of single strategy hedge funds that are audited by one of the top 10 auditors.

151.    Because of the foregoing red flags and other warnings discussed herein, the need for heightened professional skepticism required that the procedures performed by KPMG or another reputable firm include seeking corroboration of the existence of the assets and the occurrence of trades from sources independent of BMIS.  (AU §§326.08, 326.11.)  Any such attempts would have revealed the Madoff fraud.

152.    For example, Madoff and BMIS claimed to hold all of its investment advisory clients' assets—purportedly billions of dollars—in U.S. Treasuries at the end of each reporting period.  An auditor having access to BMIS's books and records easily could have sought to

corroborate the existence of these U.S. Treasuries - especially given the large amount reported by requesting confirmations from the depository institutions or clearing institutions at which book entries for these assets should have existed.  If Madoff and BMIS actually held the U.S. Treasuries reported, these confirmations would have indicated U.S. Treasuries BMIS held in the aggregate for all of its clients totaling in the multi-billions of dollars.

153.    However, no such confirmations were possible.  As Madoff admitted in his plea allocution, Madoff and BMIS held no investment advisory clients' assets in Treasuries, let alone billions of dollars worth.  Rather, according to Madoff, BMIS held only cash in an account at Chase Manhattan Bank, from which he operated his Ponzi scheme.  Accordingly, a confirmation from these depository institutions or clearing institutions would have shown only the U.S. Treasuries BMIS held for the clients of its legitimate brokerage business - an amount, if anything, that in all likelihood would have been dwarfed by the billions of dollars BMIS claimed to hold for its investment advisory clients.  In other words, seeking such confirmations, which depository institutions routinely send, very likely would have immediately revealed Madoff's and/or BMIS's fraud.

154.    KPMG also should have sought to corroborate Madoff's and/or BMIS's purported purchases and sales of equities for the Fund by (a) instructing Madoff and BMIS to request confirmation of these trades from depository or clearing organizations or counterparties to the trades, and (b) reconciling the trades to settlement reports from these organizations or counterparties.  Such procedures would have revealed either that no such trades had occurred, or that the amounts were inconsistent with the trades that the Fund reported Madoff and/or BMIS had made.

155.    With respect to the over-the-counter option trades Madoff and/or BMIS claimed to make for their investment advisory clients, Madoff testified to the SEC on or about May 19, 2006 that the counterparties to his purported option contracts were "basically European banks," and that there is "an affirmation that's generated electronically" and an electronic "master option agreement" that is attached to the affirmation that documented these option trades.  Madoff admitted in his plea allocution that these option trades never occurred.  Thus, had an auditor sought to confirm this nonexistent documentation with these European bank (and any other) counterparties, the fraud would have been immediately revealed.

156.    By whatever means, any meaningful attempt at seeking corroboration of the existence of assets and occurrence of trades independent of BMIS would have uncovered the fraud. Because KPMG issued unqualified audit opinions on the Fund's financial statements, it is clear that neither KPMG, nor any other reputable auditor at its request, ever attempted to obtain this independent corroboration.

157.    Accordingly, under no circumstances should KPMG have issued unqualified opinions on the Fund's financial statements, or claimed its audits were performed in accordance with GAAS.  By doing so, KPMG acted, at a minimum, recklessly.

**COUNT I**
**For Violations of Section 10(b) of the Exchange Act**
**And Rule 10b-5 of the Securities and Exchange Commission**
**(Against All Defendants, Except KPMG and the Controlling Defendants)**

158.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

159.    This Count is asserted against all Defendants, except for KPMG and the Controlling Defendants, and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

160.    The Defendants named in this Count directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, practices, and courses of business which operated as a fraud and deceit upon Plaintiff, and made various deceptive and untrue statements of material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff.  The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce Plaintiff to purchase limited partnership investment interests in the Fund.

161.    The Defendants named in this Count, pursuant to said scheme, plan, and unlawful course of conduct, knowingly or recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to Plaintiff as particularized above.

162.    In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said Defendants, Plaintiff relied, to its detriment, on such misleading statements and omissions in purchasing limited partnerships in the Fund.  Plaintiff has suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

163.    By reason of the foregoing, the defendants named in this Count directly violated Section 10(b) of the Exchange Act and Rule l0b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices,

and a course of business which operated as a fraud and deceit upon Plaintiff in connection with its acquisitions of limited partnership interests in the Fund.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants and Controlling Defendants)

164.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

165.    The defendants named in this Count acted as controlling persons of the Fund within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high level positions, participation in and/or awareness of the Fund's operations, and/or intimate knowledge of the Fund's products, sales, accounting, selection of investment advisors and managers, plans and implementation thereof, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Fund, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  These Defendants had the ability to prevent the issuance of the statements or cause the statements to be corrected.

166.    The defendants named in this Count had direct and supervisory involvement in the day-to-day operations of the Fund and, therefore, and had the power to control or influence the particular statements giving rise to the securities violations as alleged herein, and exercised the same.

167.    By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the wrongful conduct, Plaintiff suffered damages in connection with its acquisitions of limited partnership interests in the Fund.

## COUNT III
## Common Law Fraud
## (Against All Defendants, Except KPMG and the Controlling Defendants)

168.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

169.    Plaintiff, in reasonable and justifiable reliance upon the statements and representations made by the Defendants named in this Count, as previously set forth herein, purchased investment interests in the Fund.  Plaintiff would not have purchased investment interests in the Fund except for its reliance upon the representations made by Defendants in the PPM, performance reports, and other materials, and would never have purchased them had it been aware that the Tremont-Fund Defendants failed to conduct due diligence, or if conducted, failed to conduct an adequate due diligence, of Madoff and BMIS.

170.    At the time the statements and misrepresentations were made in the PPM by the Defendants named in this Count, performance reports, and other materials, these Defendants knew them to be false and intended to deceive Plaintiff by making such statements and representations.

171.    At the time of the false statements, misrepresentations and omissions, set forth above, each of the Defendants named herein intended that Plaintiff would act on the basis of the misrepresentations and omissions contained in the PPM, performance reports and other materials, in determining whether to purchase investment interests in the Fund.  Plaintiff reasonably relied thereon to its detriment in making such decisions.

172.    Had Plaintiff known of the material facts that the Defendants named in this Count wrongfully concealed and misrepresented, and the falsity of the Defendants' representations, Plaintiff would not have purchased investment interests in the Fund.

173.   Plaintiff, as a result of its purchase of investment interests in the Fund and by reason of the wrongful concealments and misrepresentations by the Defendants named in this Count, has sustained damages, losing all or substantially all of its respective investments in the Fund in an amount yet to be determined, and to be proven at trial.

174.   By reason of the foregoing, the Defendants named in this Count are jointly and severally liable to Plaintiff.

175.   Defendants' fraudulent acts were willful and wanton and Plaintiff is entitled to punitive damages.

## COUNT IV
### Negligent Misrepresentation
### (Against the Tremont Defendants)

176.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

177.   Defendants named in this Count owed to Plaintiff a duty: (a) to act with reasonable care in preparing and disseminating the PPM, performance reports, and other materials, which were relied upon by Plaintiff in deciding to purchase its investment interests in the Fund; and (b) to use reasonable diligence in determining the accuracy of and preparing the information contained in the PPM, performance reports, and other materials.

178.   These Defendants breached their duties to Plaintiff by failing to investigate, confirm, prepare and review with reasonable care the information contained in the PPM and performance reports, and other representations.

179.   As a direct, foreseeable and proximate result of these Defendants' negligence in performing their duties, Plaintiff has sustained damages, losing all or a substantial part of its investments in the Fund in an amount yet to be determined, and to be proven at trial.

180.    By reason of the foregoing, these Defendants are jointly and severally liable to Plaintiff.

## COUNT V
### For Breach of Fiduciary Duty
### (Against the Tremont Defendants)

181.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

182.    These Defendants have breached their fiduciary duties to Plaintiff.

183.    As a result of their duties and responsibilities, as well as their conduct with respect to the management of the assets of the Fund, for the purported benefit of the limited partners, as alleged herein, these Defendants have failed to fulfill their fiduciary duties owed to Plaintiff by acting in bad faith, with gross negligence and in utter disregard for due care and reasonable and prudent investment standards.

184.    As a proximate result of these Defendants' bad faith breach of fiduciary duties, Plaintiff has sustained damages, losing all or substantially all of its investments in the Fund in an amount yet to be determined, and to be proven at trial.

185.    By reason of the foregoing, these Defendants are liable to Plaintiff.

## COUNT VI
### For Unjust Enrichment
### (Against the Tremont Defendants and Controlling Defendants)

186.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

187.    As a result of the misconduct detailed herein, the Fund has been forced to begin liquidating, and Plaintiff's investments have been decimated; yet these Defendants have reaped substantial fees, dividends and other pecuniary benefits at the expense of Plaintiff.

188.    These Defendants have therefore been unjustly enriched and equity and good conscience require that these Defendants disgorge to Plaintiff, all such unjust enrichment in an amount to be determined at trial.

### COUNT VII
### Aiding and Abetting a Breach of Fiduciary Duty
### (Against KPMG)

189.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

190.    The Tremont Defendants owed Plaintiff fiduciary duties as alleged herein.

191.    By committing the acts alleged herein, the Tremont Defendants breached their fiduciary duties owed to Plaintiff.

192.    KPMG aided and abetted the Tremont Defendants in breaching their fiduciary duties owed to Plaintiff.   KPMG aided and abetted the Tremont Defendants' breaches of fiduciary duties, disseminated false and misleading yearly audit reports and opinions concerning the Fund's financial statements, and was an active and knowing participant in the Tremont Defendants' breaches of fiduciary duties owed to Plaintiff.   Among other things, KPMG knowingly or recklessly ignored information that indicated or should have indicated the money invested by Plaintiff in the Fund was invested with Madoff and/or BMIS and that Madoff and/or BMIS were involved in a Ponzi scheme.

### COUNT VIII
### Aiding and Abetting Breach of Fiduciary Duty
### (Against the Controlling Defendants)

193.    Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

194.    By virtue of the due diligence performed on the Fund and the Corporate Tremont Defendants during their acquisition of Tremont Advisers, and their ongoing oversight of the

Tremont Corporate Defendants, Oppenheimer and MassMutual had actual knowledge of the relationship between the Tremont Defendants and Madoff, and/or BMIS.

195.    As a result of Oppenheimer and MassMutual's due diligence into the Fund and the Tremont Corporate Defendants, as well as their oversight of the Tremont Defendants following the acquisition, Oppenheimer and MassMutual had actual knowledge of the red flags and warnings against investing with Madoff.  As a result, Oppenheimer and MassMutual were recklessly indifferent and/or willfully blind to the fiduciary breaches committed by the Tremont Defendants.

196.    Oppenheimer and MassMutual substantially assisted in breaches of fiduciary duty committed by Tremont.

197.    As a direct and proximate cause of Oppenheimer and MassMutual's wrongful conduct, Plaintiff suffered damages.

**COUNT IX**
**Breach of fiduciary Duty**
**(Against KPMG)**

198.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

199.    KPMG owed fiduciary duties to the Plaintiff.

200.    As a result of KPMG's failure to adequately investigate the Fund's investments and failure to discover the Fund's assets were invested, either in whole or in part, in a Ponzi scheme, KPMG failed to fulfill its fiduciary duty owed to the Plaintiff.  KPMG acted in bad faith, with gross negligence and with complete disregard of its obligation to use due care.

201.    As a proximate result of KPMG's breaches of its fiduciary duties, Plaintiff has sustained damages in an amount yet to be determined, and to be proven at trial.

202.   KPMG's acts were willful and wanton and Plaintiff is entitled to punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully demands judgment:

A.   Awarding compensatory damages against Defendants in favor of Plaintiff against all Defendants for damages sustained as a result of Defendants' wrongdoing together with interest therein;

B.   Awarding prejudgment interest;

C.   Awarding punitive damages as appropriate;

D.   Awarding extraordinary, equitable and/or injunctive relief as permitted by law (including, but not limited to, disgorgement);

E.   Awarding Plaintiff its costs and disbursements of this suit, including reasonable attorneys' fees, accountants' fees and experts' fees; and

F.   Awarding such other and further relief as may be just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: December 3, 2010

Respectfully Submitted,

SHALOV STONE BONNER & ROCCO LLP

By: _____

    Lee S. Shalov (lshalov@lawssb.com)
    Ralph M. Stone (rstone@lawssb.com)

    260 Madison Avenue, 17th Floor
    New York, NY 10016
    Tel:  (212) 239-4340
    Fax:  (212) 239-4310

    *Counsel for Plaintiff*