## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

ELENDOW FUND, LLC,

        Plaintiff,

        v.

RYE SELCT BROAD MARKET XL FUND,
L.P., RYE INVESTMENT MANAGEMENT,
TREMONT CAPITAL MANAGEMENT
INC., TREMONT GROUP HOLDINGS, INC,
TREMONT PARTNERS, INC.,
MASSACHUSETTS MUTUAL LIFE
INSURANCE CO., MASSMUTUAL
HOLDINGS LLC, OPPENHEIMER
ACQUISITION CORPORATION, RUPERT
ALLAN, JIM MITCHELL and ROBERT
SCHULMAN,

        Defendants

---------------------------------------------------------x

10 Civ. 9061 (TPG)

**JURY TRIAL DEMANDED**

### PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff, Elendow Fund, LLC ("Elendow"), for its First Amended Complaint (the "Amended Complaint") alleges on personal knowledge as to itself, and, as to all other allegations, upon information and belief, which is based on the investigation conducted by and through its counsel. That investigation included review of: (i) complaints filed by the United States Government, the New York Attorney General, the Trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the Securities and Exchange Commission (the "SEC") relating to the Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff"); (ii) papers and pleadings filed in actions commenced by state municipalities, administrative agencies and other investors relating to Madoff and BLMIS; (iii) private placement memoranda relating to Rye Select Broad Market XL Fund, L.P. (the "XL Fund") and other Rye funds; (iv) quarterly and periodic reports issued to Plaintiff and other investors in the

XL Fund; (v) news reports published in the financial press regarding Madoff, BLMIS and the XL Fund; and (vi) auditor reports relating to the XL Fund.[1]

## NATURE OF THE ACTION

1.      This action arises out of the $50 billion Ponzi scheme orchestrated by convicted swindler Bernard L. Madoff.   Thousands of investors throughout the world fell victim to Madoff's scam that, according to federal authorities, was unprecedented in its size and scope until it imploded in December 2008.

2.      Each of these investors was ensnared in Madoff's scheme in one of two ways. Some victims invested directly with Madoff, while the majority of victims were defrauded by investing indirectly with Madoff through an extensive network of "feeder funds" that provided Madoff with the massive and continuous infusions of monies necessary to sustain his scheme for years.   The managers of those feeder funds pocketed staggering fees from clients who relied on the managers' integrity and purported investing acumen, only to learn that those fiduciaries and purported experts had blindly channeled their assets into the hands of one of history's most reviled confidence men.

3.      Plaintiff brings this action in connection with one of Madoff's feeder funds, the XL Fund, which was operated through Defendant Tremont Group Holdings, Inc. as part of the MassMutual Financial Group.   As described below, Elendow was fraudulently induced to invest into the XL Fund based on representations and assurances made by Defendants in offering materials and other documents that Madoff and BLMIS were actually trading in securities; that BLMIS and the XL Fund were employing particular investment strategies in connection with

---

[1]      Plaintiff incorporates by reference into this Amended Complaint the Complaint dated December 7, 2010, filed on behalf of Irving H. Picard as Trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC, in the United States Bankruptcy Court for the Southern District of New York, No. 08-01789 (the "Trustee Complaint") (a copy of which is attached hereto as Exhibit 1).

their purported transactions; and that the XL Fund was "focusing on preservation of capital." Elendow was also fraudulently induced to invest in the XL Fund by Defendants' representations and assurances that the assets Madoff and BLMIS claimed to hold for the XL Fund's "Reference Entity" -- the Rye Select Broad Market Fund, L.P. (the "Market Fund") -- actually existed and were appreciating.

4.     As alleged below, the XL Fund's managers, and the corporate entities that operated, controlled and/or assisted them, either knew or turned a blind eye to Madoff's nefarious operations and reaped handsome fees for work they never performed.  Motivated by unchecked greed, the persons and entities responsible for the XL Fund, the Market Fund and other Tremont funds funneled billions of dollars into a scam they either knew about or should have detected had they made even a modestly diligent effort to do so.  At the same time, these individual and entities disseminated a series of fraudulent and misleading offering memoranda and other documents to Plaintiff, who reviewed and detrimentally relied on these materials in making investments in the XL Fund.  These false and misleading materials induced Plaintiff to invest in the XL Fund, and resulted in approximately $12 million in losses due to the shamefully avaricious conduct of the XL Fund's managers and the corporate entities that operated, controlled and/or assisted them.

5.     While fraudulently inducing Plaintiff to invest in the XL Fund, the XL Fund's managers and the entities that operated, controlled and/or assisted them, failed to monitor and investigate BLMIS and Madoff in breach of their contractual obligations to Plaintiff.  Moreover, as described in e-mails and other internal Tremont documents, Defendants had conscious knowledge of the highly suspicious practices and activities undertaken by BLMIS and Madoff that rendered Defendants' unqualified statements to Plaintiff materially false and misleading.

3

6.      Plaintiff seeks to recover its catastrophic losses from Defendant Tremont Partners, Inc., the general partner of the XL Fund; Tremont Group Holdings, Inc., the corporate parent of that general partner; and the senior executive officers of these entities.  Plaintiff also seeks to recover from defendants Massachusetts Life Insurance Company, MassMutual Holdings Company, Oppenheimer Acquisition Corp. and OppenheimerFunds, Inc. Each of these Defendants maintained extensive influence and control over and provided substantial assistance to the entities that managed and operated the XL Fund.

7.      By overlooking or consciously ignoring glaring red flags regarding Madoff's criminal enterprise, by disseminating fraudulent offering documents and other materials to Plaintiff, and by channeling millions of dollars of Plaintiff's assets into the black hole that was Madoff's Ponzi scheme, these Defendants violated the federal securities laws, committed fraud and negligent misrepresentation of fact, and breached their fiduciary and contractual obligations to Plaintiff.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC, as well as state common law.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because part of Defendants' conduct giving rise to the causes of action occurred in this District.  Defendants also conduct substantial business in this District.

## THE PARTIES

### Plaintiff

10.     Plaintiff is a Delaware corporation with its principal place of business located at 1309 South 3rd Street in Bozeman, Montana.  Plaintiff is a small investment fund composed of approximately 35 investors.

11.     Plaintiff invested $11.875 million in the XL Fund.  Of this sum, $5.875 million was invested by Plaintiff directly into the XL Fund on the following dates and in the following amounts: (a) January 1, 2008, $500,000; (b) May 1, 2008, $140,000; (c) June 1, 2008, $440,000; (d) July 1, 2008, $50,000; (e) August 1, 2008, $4.27 million; (f) November 1, 2008, $95,000; and (g) November 1, 2008, $380,000.

12.     The remaining $6 million was invested by Plaintiff through Lakeview Investment, L.P. ("Lakeview"), which, in turn, purchased limited partnership interests in the XL Fund. Lakeview has assigned to Plaintiff its interest in any and all claims traceable to this sum. Plaintiff incorporates by reference Lakeview's Verified Complaint against the XL Fund and others in an action filed in the Superior Court of the State of California, County of Marin, captioned *Lakeview Investment, LP v. Schulman, et. al.*, Civ. 1006488.  A copy of Lakeview's Verified Complaint is attached hereto as Exhibit 2.

13.     On or about December 24, 2007, Plaintiff executed a Subscription Agreement in connection with its purchase of Class A limited partnership interests in the XL Fund.  In so doing, Plaintiff became a party to the XL Fund's Amended and Restated Limited Partnership Agreement dated November 1, 2007 (the "Agreement").  The Agreement was executed by Defendant Tremont Partners, Inc. as the XL Fund's General Partner (the "General Partner").

14.     As set forth in the Agreement, the General Partner "exercises ultimate authority

over the [XL Fund] and is responsible for the day-to-day and other operations of the [XL Fund]." The Agreement further provides that the General Partner has "the right to delegate its responsibilities hereunder, including the responsibility of providing certain investment advisory, management, administrative and auditing services, to suitable parties that may be reasonably compensated by the [XL Fund]." Moreover, as set forth in the XL Fund's offering memorandum (described below), the "General Partner is accountable to the [XL Fund] as a fiduciary and consequently must exercise good faith and integrity in handling the [XL Fund's] affairs." As the offering memorandum observed, "courts have held that a limited partner may institute legal action on behalf of itself . . . to recover damages for a breach by a general partner of its fiduciary duty…"

## Defendants

### The Rye Defendants

15.     Defendant XL Fund is a Delaware limited partnership organized on or about July 13, 2006.

16.     Defendant Rye Investment Management is a division of Tremont Group Holdings, Inc. (defined below).   Rye Investment Management manages Tremont Group Holding's line of single manager investment products, including the XL Fund.  Rye Investment Management is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

17.     Unless otherwise indicated, the XL Fund and Rye Investment Management are collectively referred to as the "Rye Defendants."

### The Tremont Defendants

18.     Defendant Tremont Group Holdings, Inc. ("Tremont Group Holdings") is a holding company for Tremont Partners, Inc., Tremont Capital Management and Rye Investment

Management. Tremont Group Holdings is located at 555 Theodore Fremd Avenue, Rye, New York 10580.

19.     Defendant Tremont Partners, Inc. ("Tremont Partners") is the general partner of the XL Fund.  Tremont Partners is located at 555 Theodore Fremd Avenue, Rye, New York 10580.  As general partner, Tremont Partners is responsible for the management of the XL Fund's investment activities, and has primary responsibility for monitoring the ongoing activities of the XL Fund's investment advisors and managers, including Madoff and/or BLMIS.  Tremont Partners is a wholly-owned subsidiary of Tremont Group Holdings.  Tremont Partners is a registered investment adviser with the SEC, and, as such, Tremont Partners has a duty to act as a fiduciary and in its clients' best interests.

20.     Defendant Tremont Capital Management manages Tremont Group Holdings' family of multi-manager investment products.

21.     Tremont Group Holdings, Tremont Partners and Tremont Capital Management are collectively referred to herein as the "Tremont Corporate Defendants."

**The Individual Defendants**

22.     Defendant Robert Schulman ("Schulman") was president, Chief Executive Officer, and Chairman of the Board of Tremont Group Holdings from 1994 to 2006.  In 2006, Schulman was replaced as President of Tremont Group Holdings while continuing to serve as Chief Executive Officer.   In June 2007, Schulman stepped aside as CEO of Tremont Group Holdings and became President of Rye Investment Management while remaining Chairman of Tremont Group Holdings.  Schulman retired in July 2008.  Prior to joining Tremont Group holdings in 1994, Schulman was responsible for Smith Barney's $60 billion Consulting Services Division and Retail New Product Development. In 1982, Schulman founded the Leveraged

Product Division at E.F. Hutton and eventually assumed responsibility for all retail products offered at E.F. Hutton. Schulman resides in New York.

23.     Defendant Rupert Allan has been President of Tremont Group Holdings since 2006, and CEO since June 2007.  Allan has primary responsibility for the Tremont Capital Management fund of funds operations.

24.     Defendant Jim Mitchell is and has been president and Chief Executive Officer of Rye Investment Management since Schulman's retirement in July 2008.

25.     Defendants Schulman, Allan and Mitchell are collectively referred to herein as the "Individual Defendants."

26.     The Individual Defendants assisted in the preparation and/or review of some or all of the documents Plaintiff alleges were materially false and misleading as described below, and assisted in structuring, overseeing and/or monitoring some or all of the swap transactions in which the XL Fund participated in as described below.

27.     The Rye Defendants, Tremont Corporate Defendants and the Individual Defendants are collectively referred to herein as the "Tremont Defendants."

### The Controlling Defendants

28.     Defendant Oppenheimer Acquisition Corporation ("Oppenheimer") is a Delaware corporation and is the parent company of Tremont Group Holdings.  Oppenheimer acquired Tremont Group Holdings in 2001 (at the time, Tremont Group Holdings was known as Tremont Advisers, Inc.). Oppenheimer's headquarters are located at 2 World Financial Center, New York, New York 10281. Oppenheimer is also the parent of OppenheimerFunds, Inc. ("Oppenheimer Funds"), which is the manager of the well-known family of Oppenheimer mutual funds.

29.     Defendant Oppenheimer markets several funds with the Tremont Defendants, including the Oppenheimer Tremont Opportunity Fund, LLC and Oppenheimer Tremont Market Neutral Fund, LLC.  After its acquisition by Oppenheimer, Tremont Group Holdings marketed itself as "An OppenheimerFunds Company."

30.     Defendant MassMutual Holdings LLC ("MassMutual Holdings") is the parent company of Defendant Oppenheimer and its principal place of business is located at 1295 State Street, Springfield, Massachusetts 01111.

31.     Defendant Massachusetts Mutual Life Insurance Co. ("MassMutual") is the parent company of MassMutual Holdings.  Its headquarters are located at 1295 State Street, Springfield, Massachusetts 01111.  MassMutual is a mutually owned financial protection, accumulation and income management company and is a member of the Financial Industry Regulatory Authority ("FINRA") and the Securities Investor Protection Corporation ("SIPC").  MassMutual and its subsidiaries had more than $500 billion in assets under management at year-end 2007. MassMutual refers to itself, including its subsidiaries, such as the Oppenheimer Funds and the Corporate Tremont Defendants, as the "MassMutual Financial Group."

32.     Defendant MassMutual, as the parent company of Defendant Oppenheimer, and Oppenheimer, as the parent company of the Corporate Tremont Defendants, had the power to exercise complete control over the Tremont Defendants, including their selection and use of fund managers, their exercise of their professional responsibilities, and their marketing of funds through the use of offering materials.

33.     Defendants   Oppenheimer,   MassMutual   Holdings,   and   MassMutual   are collectively referred to herein as the "Controlling Defendants."

## SUBSTANTIVE ALLEGATIONS

### The Madoff Fraud

34.    On March 12, 2009, Madoff pled guilty to all eleven counts in the criminal information filed by the United States Attorney's Office, admitting that he perpetrated a fraud since the early 1990s (prosecutors charged that the fraud began in the early 1980s).  In his plea allocution, Madoff admitted that he never invested his investment advisory clients' funds in securities, that he never employed the split-strike conversion strategy that he (and the Tremont Defendants) touted, and that he never had custody of the securities he purportedly held for his investment advisory clients (BLMIS purportedly acted as prime broker and custodian for the assets Madoff claimed to manage for his investment advisory clients). Instead, Madoff and BLMIS merely deposited client funds into an account at Chase Manhattan Bank, and distributed money from this account to clients who requested redemptions, while also appropriating some of those funds for his own use or other purposes.

35.    Madoff also admitted that he caused to be created and sent to his clients false trading confirmation and client account statements that reflected bogus transactions and positions. These trade confirmations and account statements were designed to give the appearance that he had executed his strategy with perfect market timing - buying stocks when they were towards the bottom of the price range for a given day, and selling close to the top. Prosecutors charged that Madoff hired numerous employees with little or no prior pertinent training or experience in the securities industry to perform these and other "back office" functions.  Madoff admitted that he knew that the audited financial statements he filed with the SEC were false and misleading.  BLMIS's accountant was thereafter charged with fraud on March 18, 2009.

36.     Madoff also described in his plea allocution how he wired money between BLMIS's bank accounts and the London bank account of BLMIS United Kingdom affiliate Madoff Securities International Ltd.  Prosecutors charged that these transfers were designed to give the appearance that he was conducting securities transactions in Europe.

37.     In order to keep the Ponzi scheme running, Madoff needed money from new investors.  Notwithstanding, Madoff limited the number of investors he would deal with directly.  Consequently, Madoff accepted investments from funds sold by, among others, the Tremont Defendants.

38.     The Tremont Defendants marketed their funds such as the XL Fund to investors like Plaintiff as a gateway to Madoff's investment advisory services.  The Tremont Defendants solicited investments into their funds pursuant to private placement memoranda and other materials from individuals, charities, pension funds and retirement accounts, institutions and other entities, including other hedge funds.  Tremont Partners served as the general partner of these limited partnerships and, as general partner, retained Madoff to manage the limited partners' investments, even though they knew, or recklessly disregarded, that Madoff's investment operations involved improper conduct.

39.     In marketing their funds to investors, the Tremont Defendants represented that one of their outside investment managers, *i.e.*, Madoff, had for years achieved, and was continuing to achieve, consistent annual returns in the range of 8-12% (with positive monthly returns in virtually every month) on the monies he was managing through a hedging strategy using equities, options trading, and short selling or the so-called "split-strike conversion" strategy that entailed the purchase of 30 to 40 large capitalization S&P 500 stocks and the simultaneous sale of out-of-the-money calls on the S&P 100 Index and the purchase of out-of-

the-money puts on the S&P 100 Index.  As explained by the New York Attorney General in its action against Ezra Merkin and others *(Cuomo v. Ezra Merkin & Gabriel Capital Corp.,* NY Supreme Ct., No. *0450879/2009,* the "NY AG Action"), Madoff would purportedly (a) buy stocks of selected corporations that were included in the blue-chip S&P100 Index and simultaneously, (b) buy put options below the current stock price to protect against large declines, and (c) sell call options above the current price to fund the purchase of put options. The call options would also, to some degree, limit any gains that would be earned on the underlying stocks.  Madoff claimed that under the right market conditions, he could achieve steady returns of over ten percent per year regardless of whether the market as a whole had advanced or declined.  The Tremont Defendants represented that through use of, among others, this strategy, the investment manager (*i.e.*, Madoff) could limit losses when stock prices decline while still affording an upside potential capped to the stock price of the short call when stock prices rise.

40.    As noted in the NY AG Action, Madoff's purported investment strategy evolved slightly over time.  Madoff soon began to claim that he was using a larger "basket" of stocks selected from the S&P Index, combined with put and call options on the S&P 100 Index itself rather than options on individual stocks.  The positions were supposedly held for a short period of time lasting from a few days to no longer than about two months, and then liquidated.  Madoff claimed to execute the "split strike conversion" strategy six to eight times per year.  At some point, Madoff purportedly adopted the practice of exiting the market entirely at the very end of each quarter and putting all funds in U.S. Treasury bills ("Treasuries").  For this reason, Madoff's quarterly statements to investors, and the end-of-year audits of investor holdings, would list only Treasuries.

41.     In fact, as noted, Madoff never executed a "split strike conversion" or any other investment strategy. The court-appointed Trustee liquidating Madoff's assets has stated that he has found no evidence that, from at least 1996 to the present, any stocks or options were traded by Madoff for investors.

**Defendants' Materially False and Misleading Statements and Communications**

42.     Prior to investing in the XL Fund, Plaintiff received and reviewed the Rye Select Broad Market XL Fund, L.P. Confidential Private Placement Memorandum, dated February 1, 2007, and the Rye Select Broad Market XL Fund, L.P. Amended and Restated Confidential Private Placement Memorandum, dated November 1, 2007 (collectively the "XL Offering Memorandum."). The XL Offering Memorandum was prepared, reviewed and/or disseminated by the Tremont Defendants, and references "Rye Investment Management, A Division of Tremont Group Holdings, Inc." on the cover page.

43.     As represented in the XL Offering Memorandum, the XL Fund "seeks to provide investors with long-term capital growth through exposure, on an approximate three times levered basis, to the economic performance of the Rye Select Broad Market Fund L.P. (the 'Reference Entity')." Like the XL Fund, the Reference Entity (*i.e.*, the Market Fund), was sold and managed by the Tremont Defendants. Leverage on the Reference Entity's returns was to be achieved through swap transactions entered into by the XL Fund with one or more designated counterparties. In addition to its investment with a swap counterparty, the XL Fund had direct investments with the Reference Entity.

44.     The XL Fund Memorandum was rife with materially false and misleading statements that fraudulently induced Plaintiff to invest in the XL Fund. According to the XL Offering Memorandum, for example, the Market Fund's "objective is to seek to (i) achieve long

term capital appreciation and (ii) consistently generate positive returns irrespective of stock market volatility or direction, while focusing on preservation of capital."   The Offering Memorandum also represented that the Market Fund "attempts to accomplish this investment objective by investing the majority of the assets with one investment manager [*i.e.*, Madoff and BLMIS] who employs a 'split strike conversion' strategy. . ."

45.     The XL Offering Memorandum also made representations regarding purported "risk factors."  For example, the XL Offering Memorandum represented that "the profitability of a significant portion of the Partnership's investment program depends to a great extent on correct assessments of the future course of the price movements of securities and other investments"; there is "unpredictability as to changes in general market conditions which may affect the profitability of the Partnership's investment program"; "[w]ith respect to the investment strategies utilized by the Managers retained by the [Market Fund], there is always some, and occasionally a significant, degree of market risk"; and the Market Fund was "highly dependent upon the expertise and abilities" of Madoff and BLMIS

46.     The foregoing representations in the XL Offering Memorandum were materially false and misleading because they were created the erroneous impression that the XL Fund, the Market Fund, and BLMIS were legitimate funds and operations engaged in the actual trading of securities, which the Tremont Defendants knew or consciously ignored, were blatant falsehoods. Because Madoff and BLMIS did not engage in any trading of securities or have any investment "strategies," but instead, operated a multi-billion Ponzi scheme lasting years, the Market Fund was not "focus[ed] on the preservation of capital" (since there never was any "capital"); the XL Fund did not, and never had, an "investment program"; the "future course of the price movements of securities and other investments" was completely irrelevant to the results and

performance of the XL Fund and the Market Fund; and Madoff and BLMIS never had "investment strategies," exercised any "expertise and abilities" on behalf of the Market Fund or the XL Fund, or implemented a "split strike conversion strategy."

47.     The XL Offering Memorandum also contained materially false and misleading statements regarding the purported "**Risks of Certain Investments Made by Managers**." (bold in original). According to the XL Offering Memorandum, for example, the Market Fund is "engaged in a diversified investment strategy concentrating primarily on investing in securities through" [Madoff and BLMIS], some of which may not be marketable." In fact, the Market Fund did not have any "investment strategy" – let alone a "diversified" one – nor were there any investments in "securities" made by the XL Fund, the Market Fund, Madoff or BLMIS. The XL Offering Memorandum also cautioned that the "securities business is speculative, prices are volatile, and market movements are difficult to predict," representations designed to assure Plaintiff that there were legitimate transactions engaged in by Madoff and BLMIS, when, in fact, there were none. The XL Offering Memorandum also purported to describe the type of transactions Madoff and BLMIS might engage in, such as options transactions, short selling, forward trading, swap agreements and over-the-counter trading. In fact, Madoff and BLMIS engaged in no trading of any securities in direct contrast to the representations and assurances contained in the XL Offering Memorandum.

48.     In addition to these misrepresentations, the Tremont Defendants failed to disclose in the XL Offering Memorandum a number of material facts concerning the Market Fund's "Investment Manager" (*i.e.*, BLMIS and Madoff), which rendered the statements they voluntarily made highly misleading. Specifically, the XL Offering Memorandum failed to disclose that: (i) the purported auditor for BLMIS, Friehling & Horowitz, was a tiny three-person

operation in a New York strip mall; (ii) the Tremont Defendants had no knowledge of the counterparties to BLMIS's purported options trades because BLMIS and Madoff refused to disclose their identity; (iii) BLMIS functioned as the investment advisor, executing broker and custodian of its customer's funds and securities, which meant no independent third party was verifying the actual existence of customer assets at BLMIS or that the transactions for the Market Fund were actually occurring; (iv) BLMIS did not allow electronic access to its trade information, but instead, provided the Tremont Defendants with paper monthly statements and confirmations that it sent by standard postal mail; (v) BLMIS did not earn a fee apart from small commissions on trades, thereby leaving tens of millions of dollars of fees on the table; and (vi) BLMIS and Madoff converted the equities they supposedly purchased to Treasury bills on a quarterly and year-end basis to avoid regulatory filing requirements. These highly suspicious facts and practices regarding Madoff and BLMIS, all of which were known to the Tremont Defendants, rendered their voluntary and unqualified statements in the XL Offering Memorandum regarding the "Investment Manager" and the "investment objectives" of the Market Fund and the XL Fund grossly misleading and deprived Plaintiff of the ability to make an informed decision in connection with its investments in the XL Fund.

49.     In addition to the XL Offering Memorandum, the Tremont Defendants sent Plaintiff detailed documentary presentations regarding the XL Fund that induced Plaintiff to make additional investments in the XL Fund.  These financial disclosures included financial statements for the XL Fund, monthly performance updates for the XL Fund and e-mail communications from Henry Hodges of Rye Capital Management.  Moreover, each month beginning in January 2008 and continuing through October 2008, the Tremont Defendants disseminated "Client Statements" to Plaintiff that purported to reflect Plaintiff's "Net Closing

Capital" in the XL Fund, a "Performance Summary" for the XL Fund and Plaintiff's net income and loss regarding its investments. All of these financial disclosures were designed to, and did, induce Plaintiff to make additional investments in the XL Fund by assuring Plaintiff that the XL Fund was a legitimate investment vehicle whose assets were based upon actual securities transactions as described in the XL Offering Memorandum. Given the absence of any securities transactions – legitimate or otherwise – engaged in by the XL Fund, the Market Fund or BLMIS, these representations were materially false and misleading.

50.     The Tremont Defendants also made materially false and misleading statements regarding their supposedly "[e]ffective investment strategies and oversight" and "careful due diligence." According to Tremont Group Holding's website, for example:

> **Tremont has been at the forefront in setting the standard in the industry for fund of hedge funds investment management.** Effective investment strategies and oversight, **thorough manager research, careful due diligence**, advanced risk allocation and time-tested portfolio management form the cornerstones of a comprehensive platform that has been refined over a 23-year span of dedicated strides to maximize our clients' objectives. Our established performance history and our focus on client service distinguishes the firm at a time when the influx of new entrants creates choice but not the certainty of experience. (Emphasis added).

51.     Similarly, in its Form ADV filed with the SEC on January 1, 2006, the Tremont Defendants represented that they are "engaged on a daily basis with custodians and/or trustees to monitor cash flow and fund compliance"; that "accounts are monitored in terms of securities holdings, asset mix and adherence to investment guidelines"; and that Tremont Partners "uses its own proprietary software programs to monitor the performance of investment managers." These statements were materially false and misleading because the Tremont Defendants conducted no due diligence or oversight with respect to Madoff and BLMIS, failed to verify the existence of actual securities holdings, and failed to monitor Madoff's operations.

**Defendant's False and Misleading Statements and Communications**
**to Plaintiff were Made Knowingly, with Conscious Recklessness and/or Negligently**

52.     As described below and in the documents incorporated herein by reference, the Tremont Defendants acted knowingly, with conscious recklessness and/or negligently in connection with the false and misleading XL Offering Memorandum, Client Statements and other communications disseminated to Plaintiff.  The Tremont Defendants' culpable state of mind is demonstrated by the following facts and evidence.

> **The Tremont Defendants Received and Internally Acknowledged**
> **Multiple Warning Signs of Madoff's Fraudulent Activities that**
> **Rendered Their Statements to Plaintiff Materially False and Misleading**

53.     In its various actions arising out of the Madoff fraud, the Trustee identified a litany of admissions, conversations, reports, e-mails and other internal documents reflecting warning signs and suspicions expressed to and by the Tremont Defendants about BLMIS and Madoff prior to or contemporaneous with the false and misleading statements they made to Elendow. This evidence, which demonstrates the Tremont Defendants' knowledge, conscious recklessness and/or negligence, includes:

> a.   Conversations between Madoff and Defendant Schulman, "who was provided only vague or inconsistent descriptions by Madoff of the split-strike conversion strategy" and "vague and murky stories regarding his supposed trading counterparties…" Trustee Complaint, ¶ 89.

> b.   E-mails between Schulman and others reflecting the Tremont Defendants' refusal to allow prospective investors to meet Madoff.  *Id.*, ¶ 90.

> c.   E-mails reflecting the Tremont Defendants' awareness of negative news stories in the financial press regarding BLMIS and Madoff, including several stories described below. *Id.*, ¶¶ 118, 119.

    d.  E-mails from clients and prospective clients to the Tremont Defendants expressing concerns and suspicions about BLMIS's and Madoff's lack of transparency, the legitimacy of their operations and the accuracy of their operating results.  *Id.*, ¶¶ 158, 194, 195, 196, 197.

    e.  Confirmations of options trades received by the Tremont Defendants from BLMIS that failed to reflect the trade's counterparty, which was "contrary to the representation that these options transactions were done OTC."  *Id.*, ¶ 187.

    f.  False statements given by Tremont executives to financial institutions that the Tremont Defendants had knowledge of the counterparties to BLMIS's purported options trades when, in fact, they did not.  *Id.*, ¶ 190.

    g.  Admissions in public interviews reflecting the Tremont Defendants' awareness that Madoff insisted on secrecy and refused to be identified in fund prospectuses.  *Id.*, ¶ 192.

    h.  Concerns expressed by Tremont executives regarding the size and competence of BLMIS's three person auditing firm.  *Id.*, ¶¶215, 216, 230.

    i.  Due diligence questionnaires and reports prepared by the Tremont Defendants that acknowledged a host of concerns and risks regarding BLMIS and Madoff that went to the essence of Madoff's Ponzi scheme, including "'an inherent risk in having the Investment Advisor to the Fund also being the broker dealer'" (*id.*, ¶ 226); the "'biggest drawback' being 'lack of transparency regarding the signals used by the investment advisor'" (*id.*, ¶ 227); the Rye Funds' "relationship with Madoff, while identical to other Madoff relationships, does not represent the best industry practices" (*id.*, ¶ 229); the presence of Madoff's blood relative (his brother Peter) acting as head of firm compliance

(*id.*); the absence of information provided by Madoff regarding the counterparties to BLMIS's purported options trades (*id.*, ¶ 230); BLMIS's outside auditor, which is "'not well known in the hedge fund industry and they are a small and local firm in the New York area that does not specialize in investment firms" (*id.*) ; and Madoff's dubious explanations for not providing the Tremont Defendants with electronic information. *Id.*

54.   Additional evidence of the Tremont Defendants' knowledge, conscious recklessness and/or negligence appears in the Trustee's Complaint against ABN AMRO Bank N.V. (presently known as The Royal Bank of Scotland, N.V., or "RBS"), the XL Fund and others (the "ABN Complaint") in an adversary proceeding commenced in the United States Bankruptcy Court for the Southern District of New York, captioned *Picard v. ABN Amro Bank N.V., et. al.*, Adv. Pro. No. 10-ap-05354.   Among other things, the ABN Complaint describes several swap transactions involving ABN AMRO Bank N.V., ABN AMRO Incorporated (collectively with RBS, "ABN") and the XL Fund.   In connection with those transactions, ABN executives expressed increasing concerns and suspicions regarding BLMIS and Madoff, many of which were described in an internal Tremont memorandum entitled "September 2008 – Counterparty Update":

> **ABN/RBS**
>
> ABN is one of the larger of our counterparties.   They were acquired by ABN Amro and [sic] the start of 2008.
>
> **Issues**
>
> 1.      In the fall of 2007 we approached RBS about Madoff lending.   They indicated they were not comfortable with Madoff.
>
> 2.      It is apparent that after buying ABN is really not comfortable.
>
> * * *

> 5.   We are unhappy with ABN for many reasons.  They have verbally agreed to changes in the domestic ppm, lpa and side letter only to reject the changes. This has been going on for 9 months and they appear to not be control of their own business…

See ABN Complaint, ¶ 95.

55.   Another Complaint filed by the Trustee against the XL Fund and a swap counterparty (Fortis Prime Fund Solutions Bank (Ireland) Ltd. ["Fortis"]) (the "Fortis Complaint"), captioned *Picard v. ABN AMRO Bank (Ireland) Ltd. (f/n/a Fortis Prime Fund Solutions Bank (Ireland) Limited), et. al.*, Adv. Pro. No. 10-cv-05355, filed in the United States Bankruptcy Court for the Southern Distriet of New York, likewise reveals the Tremont Defendants' unquestioned knowledge of suspicions and unusual practices involving BMIS and Madoff.  As described in the Fortis Complaint, in May 2003, representatives of MeesPierson (a Netherlands bank acquired by Fortis in 1997), met with Madoff and senior management of Tremont Group Holding, including Defendant Robert Schulman ("Sehulman") and Cynthia Nicoll ("Nicoll"), Tremont's Chief Investment Officer.  A memorandum of that meeting reflects that Schulman and Nicoll discussed and/or learned of a variety of red flags and warning signs regarding BMIS and Madoff:

- BLMIS was "controversial because: the amount of money under advisory is undisclosed: Sandra Manzke suggests USD 20bn, Bob Schulman sticks to 'well in excess of USD 10bn') Madoff leaves all investor relations to the likes of Tremont and Fairfield and hardly grants direct meetings with end investors. Madoff does not earn a fee apart from the commissions on trades (4 ct per trade would imply about 1.5% p.a.). The annual reports will only show T-bills at the end of each year; zero transparency Madoff is self-clearing (custody with Madoff See) Returns are exceptionally stable with only 7 negative months since 1990."

- "Apart from Bernard, his brother Peter and sons Andrew and Mark hold senior management positions: see www.madoff.com."

- "Madoff is a self clearing broker. All transactions and custody are in-house. The strategy uses the Madoff clearing facilities."

- "Madoff has a limited discretion mandate for the Broad Market Fund which limits him to ca 45 stocks and options with at least 95% correlation to the index."

- "All trades as [sic] date stamped and sent to Tremont (Sue Hammond) with a 3 days delay"; and

- "Tremont sets the fee independently; Bernard does not know or even want to know to avoid any conflict of interest. He just earns money by market making 25 which makes Madoff Securities far more important to him than anything that has to do with the strategy."

*See* Fortis Complaint, ¶¶ 72, 73.

56.     In light of these highly suspicious facts and circumstances, the Tremont Defendants were indisputably aware of a clear and obvious danger -- and/or failed to review and check information they had a duty to monitor -- that their representations to Plaintiff regarding the Market Fund, the XL Fund, BLMIS and Madoff had absolutely no basis in fact and were materially false and misleading.  Thus, the Tremont Defendants knew or consciously ignored that: (i) BLMIS and Madoff were not employing a "split strike conversion" strategy or any other strategy for that matter; (ii) the Market Fund was not, and never would be, "focused on preservation of capital"; (iii) the Market Fund never employed an "investment program [that] depends to a great extent on correct assessments of the future course of the price movements of securities and other investments"; and (iv) the Market Fund was not "highly dependent upon the expertise and abilities" of Madoff and BLMIS.  At the very least, the adverse information in the Tremont Defendants' possession, which they internally discussed and acknowledged, should have alerted the Tremont Defendants that these and other similar representations regarding the XL Fund, the Market Fund, BLMIS and Madoff were dubious and of questionable veracity.

**Defendants Ignored Dozens of Other Warning**
**Signs that Madoff's Operations Were Not Legitimate**

57.     These conclusions are reinforced by a variety of additional warning signs accessible to the Tremont Defendants further demonstrating that their statements and representations to Plaintiff were untrue and omitted to disclose material facts necessary for Plaintiff to possess a full and accurate understanding of the XL Fund, the Market Fund and its "Investment Manager," BLMIS and Madoff. These numerous warnings signs included the following:

> a.      **Suspect "Strategy"**: The description of Madoff's "split-strike conversion" strategy appeared to be inconsistent with the pattern of returns in the track record, which showed only seven small monthly losses over a 14 year period.  Moreover, the returns purportedly generated by this strategy could never be replicated by quantitative analysts who attempted to do so.  Michael Markov, a hedge fund consultant, stated that he was hired by a fund in 2006 to look into one of the feeder fund's returns and found that it was "statistically impossible to replicate them." In May 1999, Harry Markopolos ("Markopolos"), a derivatives expert with experience managing the split-strike conversion strategy used by Madoff, sent a letter to the SEC describing how Madoff could not have generated the returns he reported using the split-strike conversion strategy.  As reported in May 2001, in an article titled, "Madoff Tops Charts; Skeptics Ask How," appearing in MAR/Hedge, a semi-monthly newsletter reporting on the hedge fund industry: "The best known entity using a similar strategy, a publicly traded mutual fund dating from 1978 called Gateway, has experienced far greater volatility and lower returns during the same period."

b.  **Suspect Market-Timing**: Account statements revealed a pattern of purchases at or close to daily lows and sales at or close to daily highs, which is virtually impossible to achieve with the consistency reflected in Madoff's reported results.

c.  **Impossible Options Volumes**: Trading volumes reflected in accounts were vastly in excess of actually reported trading volumes. In particular, the S&P 100 Index options that Madoff purported to trade could not handle the size of the combined FOF assets. A report from *Bloomberg* estimated that Madoff's strategy would have required at least 10 times the S&P 100 Index option contracts that traded on U.S. exchanges.

d.  **No Standalone Hedge Fund**: Madoff operated through managed accounts, rather than by setting up a hedge fund of his own, where his fees would have been much higher than the brokerage commissions he was charging. This is particularly suspicious because a hedge fund requires annual audits.

e.  **Cash Positions**: BLMIS liquidated its securities positions at the end of each quarter, presumably to avoid reporting large securities positions. In 2007, hedge fund investment adviser Aksia LLC ("Aksia") urged its clients not to invest in Madoff feeder funds concluding, among other things, that, after reviewing Madoff's holdings, they were too small to support the size of the assets Madoff claimed to be managing. Indeed, as noted, Irving Picard, the court-appointed trustee charged with sorting out what Madoff assets remain, reported that Madoff never engaged in any trades.

f.  **Lack of a Third Party Custodian and Administrator**: The FOF had administrators and auditors, but substantially all of the assets were in the custody of BLMIS. Moreover, BLMIS initiated trades in the accounts, executed the trades, and

served as custodian and administrator for the accounts. Thus, instead of using an outside prime broker as nearly all hedge funds do, Madoff was his own prime broker and custodian of all the assets he managed. A December 13, 2008 article in *The Wall Street Journal* quoted Chris Addy, founder of Castle Hall Alternatives, which vets hedge funds for clients, as follows: "There was no independent custodian involved who could prove the existence of asset . . . There's a clear and blatant conflict of interest with a manager using a related-party broker-dealer. Madoff is enormously unusual in that this is not a structure I've seen."

g.   **Obscure and Ill-Equipped Auditor**: BLMIS was audited by Friehling & Horowitz ("F&H"), which had three employees, of which one was 78 years old and living in Florida, one was a secretary, and the other was an active 47-year old accountant, whose office in Rockland County, New York was 13 feet by 18 feet. On March 18, 2009, David G. Friehling ("Friehling") was arrested and criminally charged with securities fraud and with aiding and abetting Madoff's Ponzi scheme. The SEC also filed a civil complaint against Friehling and F&H, alleging that F&H never conducted even minimal audit procedures on Madoff and/or BLMIS and failed to confirm that the securities BLMIS purportedly held on behalf of its investors actually existed.

h.   **Audit Reports**: Audit reports of BLMIS showed no evidence of customer activity whatsoever, with neither accounts payable nor accounts receivable from customers. BLMIS appeared to be nothing more than a market maker - not a firm with $17 billion in customer accounts.

i.   **Madoff Publicly Spoke of Secrecy**: Madoff perpetuated the secrecy in his public statements. As reported in the May 2001 article in MAR/Hedge, "[Madoff] won't

reveal how much capital is required to be deployed at any given time to maintain the strategy's return characteristics, but does say that 'the goal is to be 100% invested." Additionally, "[a]s for the specifics of how the firm manages risk and limits the market impact of moving so much capital in and out of positions, Madoff responds first by saying, 'I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk." On May 7, 2001, *Barron's* published an article titled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum." In that article, author Erin E. Arvedlund wrote: "When Barron's asked Madoff how he accomplishes this, he says, 'It's a proprietary strategy. I can't go into it in great detail.' 'What Madoff told us was, 'If you invest with me, you must never tell anyone that you're invested with me. It's no one's business what goes on here,' says an investment manager who took over a pool of assets that included an investment in a Madoff fund. 'When he couldn't explain to my satisfaction how they were up or down in a particular month,' he added, 'I pulled the money out.'"

j.      **Family Run Operation**: Key positions at BLMIS were controlled by Madoff family members (Madoff's brother, two sons, and niece).

k.      **Lack of Electronic Access**: BLMIS was supposedly technologically advanced but funds did not have electronic access to their accounts at BLMIS. Paper documentation provided Madoff with the ability to manufacture trade tickets purporting to confirm investment results that had not and were not occurring, and to falsify supporting documentation.

**Investment Professionals Who Did Conduct Due Diligence**
**Discovered the Red Flags Warning That Madoff Was Operating a Fraud**

58.     In the article "Madoff Tops Charts; Skeptics Ask How" appearing in the May 2001 MAR/Hedge (mentioned above), author Michael Ocrant wrote:

     a.     "Madoff has reported positive returns for the last 11-plus years in assets managed on behalf of the feeder fund known as Fairfield Sentry. . . . [The] other [feeder] funds have demonstrated equally positive track records using the same strategy for much of that period."

     b.     "Those who question the consistency of the returns . . . include current and former traders, other money managers, consultants, quantitative analysts and fund-of-funds executives, many of whom are familiar with the so-called split-strike conversion strategy used to manage the assets."

     c.     These individuals "noted that others who use or have used the strategy . . . are known to have had nowhere near the same degree of success."

     d.     "The best known entity using a similar strategy, a publicly traded mutual fund dating from 1978 called Gateway, has experienced far greater volatility and lower returns during the same period."

     e.     "The strategy and trading, [Madoff] says, are done by signals from a proprietary 'black box' system that allows for human intervention to take into account the 'gut feel' of the firm's professionals."

     f.     "As for specifics of how the firm manages risk and limits the market impact of moving so much capital in and out of positions, Madoff responds first by saying, 'I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk.'"

g.      "[Madoff] won't reveal how much capital is required to be deployed at any given time to maintain the strategy's return characteristics, but does say that 'the goal is to be 100% invested.'"

h.      "Madoff, who believes that he deserves' some credibility as a trader for 40 years,' says: 'The strategy is the strategy and the returns are the returns.' He suggests that those who believe there is something more to it and are seeking an answer beyond that are wasting their time."

59.     In the May 7, 2001, *Barron's* article, "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum," (mentioned above), Erin E. Arvedlund wrote:

a.      The private accounts managed by Madoff "have produced compound average annual returns of 15% for more than a decade.  Remarkably, some of the larger, billion-dollar Madoff-run funds have never had a down year. When Barron's asked Madoff . . . how he accomplishes this, he said, 'It's a proprietary strategy. I can't go into it in great detail.'  Nor were the firms that market Madoff's funds forthcoming…."

b.      "Still, some on Wall Street remain skeptical about how Madoff achieves such stunning double-digit returns using options alone. . . . [T]hree option strategists at major investment banks told Barron's they couldn't understand how Madoff churns out such numbers [using this strategy]."

c.      Adding further mystery to Madoff's motives is the fact that "he charges no fees for his money management services."

d.      "The lessons of Long-Term Capital Management's collapse are that investors need, or should want, transparency in their money manager's investment strategy. But Madoff's investors rave about his performance - even though they don't

understand how he does it. 'Even knowledgeable people can't really tell you what he's doing,' one very satisfied investor told Barron's. 'People who have all the trade confirmations and statements still can't define it very well.' . . . This investor declined to be quoted by name. Why? Because Madoff politely requests that his investors not reveal that he runs their money."

        e.      "'What Madoff told us was, 'If you invest with me, you must never tell anyone that you're invested with me. It's no one's business what goes on here,' says an investment manager who took over a pool of assets that included an investment in a Madoff fund. 'When he couldn't explain how they were up or down in a particular month,' he added, 'I pulled the money out.'"

60.     In addition to the foregoing, on November 7, 2005, Harry Markopolos submitted a letter to the SEC, titled "The World's Largest Hedge Fund is a Fraud," in which he set forth in over 17 single-spaced pages and a two-page attachment, how Madoff's returns could not be real. Markopolos identified 29 red flags that were signs of highly suspicious activity in BLMIS, including, among others:

        a.      "[W]hy would B[ernie] M[adoff] settle for charging only undisclosed commissions when he could earn standard hedge fund fees of 1% management fee + 20% of the profits?"

        b.      "The third party hedge funds and fund of funds that market this hedge fund strategy that invests in BM don't name and aren't allowed to name Bernie Madoff as the actual manager in their performance summaries or marketing literature. . . . . Why the need for such secrecy? If I was the world's largest hedge fund and had great returns, I'd want all the publicity I could garner and would want to appear as the world's largest

hedge fund in all the industry rankings."

        c.      "It is mathematically impossible for a strategy using index call options and index put options to have such a low correlation to the market where its returns are supposedly being generated from.  This makes no sense!  .  .  .  However, BM's performance numbers show only 7 extremely small [monthly] losses during 14 ½ years and these numbers are too good to be true.  The largest one month loss was only -55 basis points (-0.55%) or just over one-half of one percent!  And BM never had more than a one month losing streak!"

        d.      "Madoff does not allow outside performance audits."

        e.      "Madoff's returns are not consistent with the one publicly traded option income fund with a history as long as Madoff's."

        f.      "Why is Bernie Madoff borrowing money at an average rate of 16.00% per annum and allowing these third party hedge funds, fund of funds to pocket their 1% and 20% fees bases [sic] upon Bernie Madoff's hard work and brains?  Does this make any sense at all? Typically FOF's [funds of funds] charge only 1% and 10%, yet BM allows them the extra 10%.  Why?  And why do these third parties fail to mention Bernie Madoff in their marketing literature?  After all he's the manager, don't investors have a right to know who's managing their money?"

        g.      "BM goes to 100% cash for every December 31st year-end according to one FOF invested with BM. This allows for 'cleaner financial statements' according to this source.  Any unusual transfers or activity near a quarter-end or year-end is a red flag for fraud."

61.     As summed up by Markopolos: "If I was the world's largest hedge fund and had

great returns, I'd want all the publicity I could garner and would want to appear as the world's largest hedge fund in all of the industry rankings.  Name one mutual fund company, Venture Capital firm, or LBO firm which doesn't brag about the size of their largest funds' assets under management. Then ask yourself, why would the world's largest hedge fund manager be so secretive that he didn't even want his investors to know that he was investing their money?  Or is it that [Madoff] doesn't want the SEC and [the Financial Services Authority] to know that he exists?"

62.     In 2007, Aksia urged its clients not to invest in Madoff feeder funds after performing due diligence on Madoff and discovered several red flags, including:

        a.     Madoff's comptroller was based in Bermuda, whereas most mainstream hedge funds have their own in-house comptrollers;

        b.     Madoff's auditor, F&H, operated out of a 13 x 18 foot location in New City, New York, and included one partner in his late 70s who lives in Florida, a secretary, and one active accountant, whereas most hedge funds are audited by a Big Three accounting firm. F&H is now under investigation by the district attorney of Rockland County; and

        c.     Aksia discovered the 2005 letter from Markopolos to the SEC described above.

63.     Aksia prepared its client advisory after, among other things, reviewing the stock holdings of BLMIS that were reported in quarterly statements filed with the SEC. Aksia concluded that the holdings appeared to be too small to support the size of the assets Madoff claimed to be managing. The reason for this was revealed on December 15, 2008, when investigators working at Madoff's New York offices concluded that Madoff had been operating a

secret, unregistered investment vehicle from his office.

64.     In addition to the foregoing, investment advisors and professionals, who thoroughly looked into Madoff's trading, were unable to reconcile investors' account statements with the reported returns. In a December 13, 2008 article in *The New York Times,* Robert Rosenkranz, principal of hedge fund adviser Acorn Partners, was quoted as saying, "Our due diligence, which got into both account statements of [Madoff's] customers, and the audited statements of Madoff Securities, which he filed with the S.E.C., made it seem highly likely that the account statements themselves were just pieces of paper that were generated in connection with some sort of fraudulent activity."

65.     As noted earlier, Madoff was his own prime broker and custodian of all the assets he managed.  As Chris Addy told *The Wall Street Journal* on December 13, 2008, such conduct was unusual because without an independent custodian, there was no one "involved who could prove the existence of assets." According to Addy, "There's a clear and blatant conflict of interest with a manager using a related-party broker-dealer."

66.     Had Defendants conducted due diligence into Madoff, BLMIS, and/or Madoff-controlled entities, they would have discovered at least some of the dozens of red flags identified herein.  At the very least, like Aksia, Defendants should have been able to discover the existence of Markopolos' letter, which would put them on notice of at least some of the red flags identified therein.

67.     Instead, Defendants relied on the "reputation" of Madoff without conducting any investigation of the *bona fides* of Madoff and his operations, and/or an analysis of the trading strategies and investment returns reported by Madoff, which remained consistently high even during adverse market conditions.

**The Tremont Defendants' Assets Were Frozen Based In Part On An
Investigator's Opinion That Tremont Should Have Discovered The Red Flags**

68.     On March 20, 2009, a Connecticut Superior Court judge issued a temporary restraining order, freezing the assets of the Tremont Defendants in a case brought by the pension funds of the Connecticut town of Fairfield (CV 095023735) (the "Fairfield Action"). The plaintiffs in the Fairfield Action asserted claims under statutory and common law arising from the same facts and circumstances as alleged herein against Tremont Partners, Tremont Group Holdings, Oppenheimer Acquisition Corp., Manzke and Schulman, among others.

69.     In support of their motion for a temporary restraining order, the plaintiffs in the Fairfield Action submitted the affidavit of Edward H. Siedle (the "Siedle Aff."). Siedle is a securities industry investigator with 25 years of experience investigating non-traditional and alternative asset managers, including hedge funds.

70.     Siedle conducted an extensive investigation of the Tremont Defendants. Siedle's affidavit is exhaustive and his findings about certain Tremont Defendants here warrant quoting at length:

> Tremont Partners, and its principals, Manzke and Schulman . . . were all aware that Bernard L. Madoff was engaging in illegal conduct in connection with his purported money management operations and intentionally chose to participate in and support Madoff's illegal conduct in order to reap enormous illicit financial benefits. . . . (Siedle Aff. ¶4).
>
> Tremont principal Manzke, and Tremont investment professionals Suzanne Hammond and Catherine Sweeney (senior managers at the firm), all had substantial experience serving as fiduciaries to pension plans performing due diligence reviews of money managers as a result of their years of former employment at Rogers, Casey & Barksdale, Inc., a well-known, highly regarded pension fund consulting firm. Tremont principal Schulman, prior to his joining Tremont in 1994 as President and co-CEO, was Executive Vice President for Smith Barney where he headed up its $60 billion Consulting Services Division. Thus, Manzke and Schulman and their associates at Tremont were highly experienced

in performing due diligence reviews of investment managers. . . .
(Siedle Aff. ¶12(a)).

Critical to Madoff's purported investment strategy was the
purchase and sale of put and call options on the billions of dollars
of securities under his management.  Given the enormous amount
of the assets under management with Madoff purportedly invested
in the strategy and the level of options trading required to
implement the strategy, there were not enough listed and over-the-
counter index options to support Madoff's level of trading.
Further, the large volume of option trades that the strategy would
have generated would have had a profound impact upon the
market.  **Market professionals purporting to review Madoff's
trading activity — as the Tremont . . . professional[s]  . . .
represented they were carefully doing — would have been
immediately aware of these fundamental disparities between
what Madoff said he was doing and what the marketplace data
showed (to the contrary).  Likewise, it would be apparent to
any market professional reviewing Madoff's purported trades
that there is no evidence of the substantial block trades of the
billions of dollars of securities in Madoff's purported strategy
that would have been required. Further, press accounts
indicate that even a cursory analysis of the stock trades
reported on the account statements issued by Madoff
compared against the actual trading prices on the relevant
dates would have shown that the prices did not match.  Quite
clearly, it would be fundamentally apparent to any market
professional performing due diligence on Madoff's trading
activity that he was not trading the securities or options
necessary to implement his purported  split-strike conversion
strategy**. . . . (Siedle Aff. ¶12(f)) (emphasis added).

Any market professional would have been very troubled by the
way in which Madoff purported to verify his purported trading
activity.  Madoff's requirement that his investors custody their
assets at BLMIS, as opposed to at a third party custodian, was
unusual and posed real dangers, including lack of independent
verification of assets within accounts and related returns.
Moreover, the form of the BLMIS statements was outdated and
lacking in detail, which was also both surprising and of concern
from a verification standpoint.  Annual audits of Madoff's trading
activities and holdings by a qualified, national auditing firm might
have allayed these concerns; however, Madoff's auditor was a
three-person firm which did not have the qualifications or expertise
to audit an advisor with $17 billion in reported assets. **While start-
up companies sometimes use small auditing firms, it is unheard**

**of for an established firm with billions under management to use such an auditor**. . . . (Siedle Aff. ¶12(f)) (emphasis added).

Other investment managers have noted inconsistencies between customer account statements and the audited BLMIS financial statements filed with the SEC. The stock holdings reported in the quarterly statements of BLMIS filed with the SEC appeared too small to support the size of the assets Madoff claimed to be managing. . . . (Siedle Aff. ¶12(f)).

The degree of secrecy insisted upon by Madoff was highly unusual and suspicious. While successful investment managers generally seek to tout their level of assets under management and their investment strategy and to be responsive to increasing demands for transparency, Madoff's refusal to provide information raised serious concerns with some cautious managers and advisors. (Siedle Aff. ¶12(f)).

The fee arrangement between Madoff and the "feeder firms" was the opposite of convention and counter-intuitive: Madoff, the investment fund manager who generated the exceptional returns, was paid a low commission-based fee, while the marketing firms received rich performance-like fees. **Thus, Tremont, which charged over 1% for placing funds with Madoff, was scheduled to receive over $30 million in fees in 2008 on the $3.3 billion it had placed with Madoff. . . . All of these enormous fees were paid to the "feeder firms" for what was essentially marketing Madoff. Madoff's willingness to part with such rich fees, which ordinarily would be retained by the investment manager, not the marketer, was a blatant "red flag." [ . . . ]** (Siedle Aff. ¶12(f)) (emphasis added).

Such major financial institutions as Goldman Sachs, Merrill Lynch, Credit Suisse and Societe Generale were so uncomfortable with Madoff's refusal to provide a satisfactory explanation for his claimed success and the numerous red flags raising suspicions about the legality of his operations that they prohibited investments with Madoff. Likewise, published reports document that a number of established financial advisors, including Aksia LLC, an independent hedge fund research and advisory firm, Acorn Advisory Capital, LP, an investment advisory firm, and others, refused to do business with Madoff for similar reason[s]. . . . (Siedle Aff. ¶14).

As a result of the substantial customer order flow at BLMIS, a plausible explanation for Madoff's superior investment

performance in rising and declining markets was that Madoff was illegally "front-running" BLMIS's securities customers' orders. Indeed, this theory was discussed in the 2001 Barron's article referenced earlier, and FGG actually touted its "market-timing" ability as the basis for the returns it Madoff-invested hedge funds were obtained [sic].  (Siedle Aff. ¶22).

71.     Siedle summarized his conclusions on Tremont in a way that can only be called

damning:

> Tremont Partners, thus, had a fiduciary and professional duty to the plaintiffs['] Plans in two respects - first, as general partner of the Rye Select hedge funds in which the Plans invested, and second, as the Plans' independent investment advisor. In my opinion, Tremont Partners (and its principals) breached its fiduciary and professional duties to the plaintiffs['] Plans in both of these capacities.  Even if Tremont Partners (and its principals) did not actually know (or close their eyes to avoid knowing) that Madoff was involved in criminal activity, it was, in my opinion, a breach of Tremont Partners' fiduciary responsibility as the Plans' advisor and professionally negligent for Tremont Partners to fail to advise the Plans of the serious questions that existed concerning the legality of Madoff's investment activities and of the unsuitability of an investment of public pension funds with Madoff by the plaintiffs['] Plans. Furthermore, if they did not actually know (or close their eyes to avoid knowing) that Madoff was involved in criminal activity, it was a breach of fiduciary duty and professionally negligent for Tremont Partners (and its principals) to fail to perform an adequate due diligence investigation of Madoff[']s investment activities to uncover such illegality or, at a minimum, to determine that they were unable to verify Madoff's claimed returns. (Siedle Aff. ¶23.)

72.     Based on the opinions in the Siedle Affidavit, the complaint in the Fairfield Case,

and other affidavits, the judge issued a temporary restraining order freezing the assets of, among

others, Tremont Partners, Tremont Group Holdings, Oppenheimer, Manzke, and Schulman.  The

entry of a temporary restraining order is significant because it means that the court found that the

plaintiffs in the Fairfield Action are likely to succeed on the merits.

**Allegations Regarding the Controlling Defendants**

**Oppenheimer Acquires Tremont**

73.     In 2001, Oppenheimer acquired Defendant Tremont Advisers, Inc. ("Tremont Advisers") for $145.3 million.  Tremont Advisers is now known as Tremont Group Holding.  In the acquisition, shareholders of Tremont Advisers received $19 per share, which represented a significant premium over the price of Tremont Group Holdings' stock prior to the acquisition.

74.     As described in the Schedule 14A Proxy Statement filed by Tremont Advisers on August 20, 2001 soliciting votes in favor of the acquisition (the "Proxy Statement"), Oppenheimer "had been actively evaluating the alternative asset management industry and had discussed Tremont with representatives of Putnam Lovell" in the fourth quarter of 2000. Tremont Advisers later retained Putnam Advisors as its financial advisor on the deal.

75.     By the time of the acquisition, Tremont Advisers was an extremely profitable company. Its total revenues from all sources had increased from $10,656,100 in 1998, to $16,524,600 in 1999, to $23,177,500 in 2000.

76.     According to Tremont Advisers' Form 10-KSB for 2000 ("2000 10-K"), more than half of Tremont Advisers' revenues came from the fees it collected on its proprietary funds. In 2000, Tremont Advisers' revenues from its funds totaled $11,874,400, representing 51.2% of Tremont Advisers' total revenues. Moreover, its fund revenues had increased dramatically between 1998 and 2000. According to the 2000 10-K, "[f]ees from the Company's proprietary investment funds increased 45.9% from $8,139,500 in the year ended December 31, 1999 to $11,874,400 for the year ended December 31,2000 and 67.6% from $4,855,600 in the year ended December 31, 1998 to $8,139,500 for the year ended December 31, 1999, in both cases due to

the growth of the funds' net assets caused by additional investor capital contributions and positive investment performance."

77.     Tremont Advisers attributed the success of its funds to the managers it selected to invest fund assets. Indeed, according to the 2000 10-K, Tremont Advisers' "proprietary investment funds were originally created to provide clients with vehicles for investment with 'hard-to-access managers.'" The 2000 10-K also stated that: "Tremont's single-manager funds offer access to managers who have undergone review by the Company's research department and investment committee. The Company sponsors only the funds of those managers it believes to be the 'best in class,' who generally have at least a 12 month track record and $50 million under management." Tremont Advisers' "hard-to-access" and "best in class" manager was Madoff.

78.     According to the Proxy Statement, in early March 2001, Oppenheimer approached Putnam Lovell and expressed interest in exploring a potential strategic transaction with Tremont Advisers. After discussions between high level executives of both companies, including Manzke and Schulman for Tremont Advisers, Oppenheimer and Tremont Advisers decided to continue their discussions, and, on March 14, 2001, entered into a confidentiality agreement. Putnam Lovell then provided Oppenheimer with a due diligence packet it had assembled on Tremont Advisers, which included "a description of Tremont's various business lines, an overview of its investments and distribution platform, its strategic relationships, its distribution needs and its financial projections."

79.     Oppenheimer was also given access to Tremont Advisers' "data room" which, according to the Proxy Statement, "housed an extensive list of Tremont due diligence material including legal contracts, corporate documents, regulatory filings, audited and unaudited

financial statements." Oppenheimer then conducted extensive due diligence on Tremont Advisers, including its funds, its fund managers, and its due diligence procedures.

80.    According to the Proxy Statement, as part of Oppenheimer's due diligence, Tremont Advisers provided to Oppenheimer "true, correct and complete copies of the offering documents, subscription agreements, administrative services agreements, distribution or placement agency agreements, solicitation agreements and custody agreements, as applicable, or any similar agreements, in any case pertaining to the Funds and used since January 1, 1998."

81.    Tremont Advisers also "agreed to afford to Oppenheimer and its representatives reasonable and prompt access to our information, assets and personnel and to make available to Oppenheimer on a timely basis a copy of each material document filed, furnished or received by us pursuant to the requirements of domestic or foreign laws and all other information reasonably requested by Oppenheimer concerning our business, properties and personnel."

82.    Indeed, in the proxy statement Tremont Advisers represented and warranted that it had provided Oppenheimer with "each Company Contract between the Company, any of its Subsidiaries or any of the Funds and any other Person . . . in which the Company, any of its Subsidiaries or any of the Funds owns an equity interest," and "each other Company Contract material to the business, governance, operations or financial condition of the Company, any of its Subsidiaries or any of the Funds." Any contract between Tremont Advisers and Madoff or BLMIS, therefore, would have been analyzed by Oppenheimer during due diligence.

83.    As part of its due diligence, Oppenheimer also had various meetings with Tremont Advisers personnel, including Manzke and Schulman, which, according to the Proxy Statement, "focused on various business function areas, such as sales and marketing, accounting and administration and manager research." Thus, Oppenheimer had full access to all information

pertaining to Tremont Advisers' "strategic relationships," due diligence on the investment managers of its funds, and the due diligence procedures Tremont Advisers employed.

84.     Oppenheimer's due diligence continued for three months until mid-June 2001. As a result of its extensive due diligence, Oppenheimer would have discovered that Tremont Advisers' "hard-to-access" and "best in class" manager was Madoff. Oppenheimer also would have discovered that the robust revenue stream Tremont Advisers derived from its funds was largely due to its retention of Madoff.

85.     Indeed, Putnam Lovell, which had numerous meetings and discussions with Oppenheimer executives during the due diligence process, in analyzing the financial fairness of the merger, considered "the significant contribution to Tremont's revenues from a single relationship it has with an investment manager to its proprietary investment products." Therefore, Oppenheimer knew that if it acquired Tremont Advisers, it was acquiring the latter's extremely lucrative "single relationship" with Madoff.

86.     On July 10, 2001, Oppenheimer and Tremont Advisers entered into the Merger Agreement pursuant to which Oppenheimer acquired Tremont Advisers for $145.3 million. The purchase price represented over thirty-six times Tremont Advisers' net income in 2000, and ten times Tremont Advisers' pro forma balance sheet. Oppenheimer financed the transaction using cash on hand, and, if necessary, capital contributions by Oppenheimer's parent MassMutual.

87.     As part of the merger, Oppenheimer's subsidiary, OppenheimerFunds, entered into employment agreements with Manzke and Schulman, the Co-Chief Executive Officers of Tremont Advisers, whereby Manzke and Schulman would retain their positions for five years following the merger.

88.     Under their respective employment agreements, Manzke and Schulman were to receive annual salaries of $500,000 each and would be eligible for annual discretionary bonuses of up to 150% of their base salaries, but no less than the lower of $500,000 or 20% of a bonus pool.  The bonus pool was to consist of up to 22.5% of the annual EBITDA of Tremont Advisers for 2002 and beyond.  Oppenheimer was willing to pay Manzke and Schulman these amounts because they had the relationship with Madoff, and Oppenheimer wanted to make sure their relationship would continue after it acquired Tremont Advisers.  In fact, one of the conditions under which Oppenheimer could terminate the merger was if these employment agreements with Manzke and Schulman were not in effect at the time of the closing of the merger.

89.     Oppenheimer hoped to profit from its acquisition of Tremont Advisers by making its funds widely available to the investing public. In a July 10, 2001 press release announcing the merger, John V. Murpy, then Chairman and CEO of Oppenheimer Funds, stated "Tremont's unique product offerings, in combination with our distribution network, will open up the world of alternative investing to a new segment of investors."

90.     In its press release announcing the merger, Tremont Advisers also touted the benefits of Oppenheimer's distribution network to increasing the availability of Tremont Advisers' funds.  In this regard, Schulman stated, "[o]ur alliance with OppenheimerFunds is an excellent strategic fit that brings together Tremont's capabilities in creating alternative investment products with Oppenheimer's strong financial intermediary relationships and unparalleled distribution talents."

91.     Oppenheimer's acquisition of Tremont Advisers and its funds allowed Oppenheimer to fill a gap in its product line and generate greater profits by making the funds available to a larger pool of investors.  As Kurt Wolfgruber, the Director of Domestic Equities at

Oppenheimer Funds, was quoted as saying in a July 11, 2001 article in *The New York Times:* "Tremont fits perfectly with our goal of extending both our product line and our client base," adding that "[o]ur clients have been asking for hedge funds more frequently."

92. Similarly, in a July 10, 2001 Press Release about the merger in *The Financial Times,* John V. Murphy, then Chairman and CEO of Oppenheimer Funds, was quoted as saying: "We believe Tremont's multi-manager, fund-of-funds approach to hedge fund investing will appeal to many of our-high-net-worth-shareholders."

93. The merger was consummated in October 2001. Following the merger, Tremont Advisers marketed itself as "An OppenheimerFunds Company."

94. Further, Tremont Advisers emphasized its connection to Oppenheimer and MassMutual in its marketing materials. In describing its privacy policy in its private placement memoranda for its funds, Tremont Advisers stated:

> Tremont is made up of certain entities, including its investment advisory and broker-dealer subsidiaries, and, in turn, is part of a larger corporate affiliation owned by the OppenheimerFunds group and Massachusetts Mutual Life Insurance Company. The Tremont entities and, in some cases, its ownership affiliates often work together to provide the financial products and services offered to Tremont Clients. By sharing information about Tremont's Clients among these companies and affiliates, Tremont can serve Clients more efficiently. Tremont is permitted to share information concerning Client account history and experiences within and among the companies that comprise Tremont and its subsidiaries and affiliates.

### MassMutual Represented Itself, Oppenheimer and Tremont Group Holdings As Being Part of One Integrated Financial Services Company

95. MassMutual markets itself and its subsidiaries, such as Oppenheimer Funds and Tremont Group Holdings, as one integrated financial services company under the name the "MassMutual Financial Group." MassMutual's annual reports include discussions of its life

insurance, mutual fund and asset management businesses, among others, and its consolidated financial statements report results from each of these businesses.

96.     MassMutual's annual reports for 2005, 2006, and 2007 state that "Massachusetts Mutual Life Insurance Company and its subsidiaries have offices around the globe," and list and provide contact information for "OppenheimerFunds, Inc., Tremont Group Holdings, Inc. and Tremont Capital Management Ltd."   The three subsidiaries are identified as "general agencies and other offices."

97.     In describing its "Corporate Operations" in its 2005 Annual Report, MassMutual refers to itself as a "diversified financial services organization" and states that: "When leveraged across the enterprise, [our] resources help us increase efficiencies and take advantage of economies of scale, ensuring that people in our lines of business can focus on their primary objective: to develop, distribute and service a wide variety of financial products to help our customers meet their needs."

98.     In its 2005 Annual Report, Mass Mutual also touted the strength of its asset management business, which includes Oppenheimer Funds and Tremont Group Holdings, writing: "The MassMutual Financial Group companies have the experience and disciplined financial expertise required by today's sophisticated individual, corporate and institutional investors. From $325.8 billion in 2004 to $395.9 billion as of year-end 2005, assets under management at our companies, including OppenheimerFunds, Inc . . . increased more than 22 percent.  This reflects the confidence investors have in our asset management capabilities."

99.     In the 2005 Annual Report, MassMutual singled out the success of its subsidiaries that are "funds of funds" such as the Tremont Funds: "Similarly, the company's businesses serving affluent investors continued to grow, expanding offerings and gaining traction in key

products such as hedge funds of funds, separately managed accounts and college savings plans. As a result, these businesses now collectively manage over $8.5 billion in assets, with sales up 15 percent over last year." The Annual Report further noted that: "In late 2005, OppenheimerFunds, along with its subsidiaries and controlled affiliates, reached a significant milestone, surpassing $200 billion in assets under management."

100.    Similarly, in its 2006 Annual Report, MassMutual reported that Oppenheimer Funds and its controlled affiliates:

> have helped investors realize their financial goals by offering diverse investment products, strong long-term investment performance and excellent customer service. The company's consistent focus on long-term investing, building lasting partnerships with financial advisors and maintaining a values-based culture is the foundation of its success and the springboard for its continued growth.
>
> Each of the company's business lines—serving retail and institutional clients—experienced significant growth in 2006. Sales for the company totaled $59.7 billion, up 29 percent over 2005; assets under management were $244.1 billion at year-end 2006, a 19.5 percent increase over the previous year.  This marks the company's fourth consecutive year of record results.

101.    In its 2007 Annual Report, MassMutual stated that Oppenheimer Funds is "[o]ne of the nation's largest and most respected investment management companies, [and] OppenheimerFunds has been helping investors realize their financial goals for nearly a half century. OppenheimerFunds and its controlled affiliates offer a broad range of products and services."

102.    The 2007 MassMutual Annual Report also emphasized the interconnected relationships among MassMutual and its investment subsidiaries and that such relationships enhanced MassMutual's overall financial strength and stability: "The MassMutual Financial Group of companies includes a number of respected investment management companies.  If you

have an insurance policy or retirement plan with us, your money is often managed by these industry leaders. Or, they can serve you and other investors independently. Their presence in the MassMutual Financial Group enhances our overall financial strength and stability."

103.   In addition, according to its 2007 Annual Report, MassMutual has agreements with its affiliates, such as Oppenheimer Funds, to provide record-keeping and other services. As of December 31, 2007, these affiliates owed MassMutual $17 million.

104.   MassMutual also acknowledged the role its subsidiaries, such as Oppenheimer Funds and Tremont Group Holdings, played in its overall success as a company. In a 2008 MassMutual publication entitled "The Keys to Investment Management," MassMutual states: "Our investment management expertise, which is integral to the success of our company and products, is drawn from our investment subsidiaries." These investment subsidiaries include Oppenheimer Funds and Tremont Group Holdings.

105.   In its 2008 Annual Report, MassMutual referred to Oppenheimer Funds as "[o]ne of the nation's largest and most respected investment managements companies," and reiterated that Oppenheimer Funds and "its controlled affiliates offer a broad range of products and services to individuals, corporations and institutions."

106.   In addition, Manzke and Schulman, who were hired as executives of Oppenheimer Funds as part of the merger, enjoyed the same benefits as other Oppenheimer Funds executives. According to the Proxy Statement, Manzke and Schulman would "receive employee benefits on the same basis as other similarly situated Oppenheimer Funds [OppenheimerFunds, Inc.] executives," and participate in a bonus pool established for Tremont Group Holdings that was "consistent with Oppenheimer's overall bonus arrangements." Under their respective employment agreements, Manzke and Schulman had the right to terminate their

employment if among other things, there was "a material diminution of the level of the executive's title and reporting position to the board of directors of Tremont Group Holdings, Oppenheimer Funds or Oppenheimer from those in effect immediately following the completion of the merger."

107.    After the acquisition of Tremont Group Holdings, MassMutual operated and marketed itself as a single, integrated financial services company comprised of its life insurance business and its investment subsidiaries such as Oppenheimer Funds and Tremont Group Holdings. MassMutual therefore controlled Tremont Group Holdings and is chargeable for Tremont Group Holdings' false statements and material omissions in the Funds' private placement memoranda, the ongoing false statements and material omissions in other communications, and Tremont Group Holdings' failure to discharge its professional duties in a manner consistent with its fiduciary obligations.

### MassMutual and Oppenheimer Controlled the Tremont Defendants

108.    MassMutual, through its control of Oppenheimer, controlled the Tremont Defendants.

109.    Oppenheimer is a majority-owned subsidiary of MassMutual Holdings Trust I ("MassMutual Trust"), a Massachusetts business trust, which is controlled by MassMutual Holdings Company, a Delaware corporation ("MassMutual Holdings"). MassMutual Holdings, in turn, is controlled by MassMutual.

110.    MassMutual appointed its own employees on the boards of Oppenheimer and MassMutual Trust, both of which it controlled. For example, after Oppenheimer acquired Tremont Group Holdings, the following MassMutual employees were members of the board of directors of both Oppenheimer and MassMutual Trust: Howard E. Gunton, Executive Vice

President and Chief Financial Officer of MassMutual; Stuart H. Reese, Executive Vice President and Chief Investment Officer of MassMutual; John V. Murphy, Executive Vice President of MassMutual; Lawrence W. Burkett, Jr., Executive Vice President and General Counsel of MassMutual; and Ann F. Lomeli, Senior Vice President, Secretary and Deputy General Counsel for MassMutual.

111.    MassMutual's majority stock ownership of Oppenheimer and its installment of its own officers in high level executive positions at Oppenheimer gave MassMutual control over all aspects of Oppenheimer and Oppenheimer's subsidiaries, including Oppenheimer Funds and Tremont Group Holdings.

112.    Further, MassMutual and Oppenheimer executives controlled the Tremont Defendants as directors.

113.    John V. Murphy, was a director of Tremont Capital from 2001-2009, the President and a director of Oppenheimer from 2001-2009, Chairman, President and Chief Executive Officer of Oppenheimer Funds from 2001-2008, the Chairman of Oppenheimer Funds in 2009, and Executive Vice President of MassMutual from 2001-2009.

114.    Michael T. Rollins was a director of Tremont Group Holdings in 2007, Senior Vice President of MassMutual in 2005, and Executive Vice President and Chief Financial Officer of MassMutual from 2006-2009.

115.    Kurt Wolfgruber was a director of Tremont Capital from 2003-2009, the Director of Domestic Equities of Oppenheimer Funds from 2001-2003, Chief Investment Officer of Oppenheimer Funds from 2003-2007, and Chief Investment Officer and President of Oppenheimer Funds from 2007-2009.

116.   In addition, individuals employed by or affiliated with MassMutual and Oppenheimer controlled the board of directors of hedge funds that were advised by Oppenheimer Funds and sub-advised by Tremont Partners.  For example, according to the Annual Report of the Tremont Core Strategies Fund, the fund had one insider trustee, John V. Murphy, who was the President and Principal Executive Officer of the Fund, and also the President of Oppenheimer, Chairman of Oppenheimer Funds and Executive Vice President of MassMutual. While the other ten trustees of the fund were characterized as independent trustees, all of them had an affiliation with Oppenheimer Funds as overseers of other portfolios in the Oppenheimer Funds complex. Brian F. Wruble and David K. Downes each oversaw portfolios of 64 Oppenheimer Funds funds, and the following trustees oversaw 54 Oppenheimer Funds funds: Matthew P. Fink, Robert G. Galli, Phillip A. Griffiths, Mary F. Miller, Joel W. Motley, Russell S. Reynolds, Jr., Joseph W. Wikler and Peter I. Wold.

**Oppenheimer Funds, as the Advisor to the Oppenheimer Tremont Funds, Knew or Should Have Known Tremont Invested Fund Assets With Madoff**

117.   Following the merger, MassMutual and Oppenheimer established, among others, the Oppenheimer Tremont Market Neutral Fund, LLC ("Oppenheimer Tremont MNF") and the Oppenheimer Tremont Opportunity Fund, LLC ("Oppenheimer Tremont Opportunity"). According to their prospectuses, Oppenheimer Funds was the investment adviser and Tremont Partners was the investment manager of the funds, subject to supervision by Oppenheimer Funds.

118.   As investment adviser to the funds, Oppenheimer Funds, subject to the ultimate supervision of and subject to any policies established by the fund's board, was ". . . responsible for developing, implementing and supervising the Fund's investment program and for providing

various administrative services to the Fund. . . ."  Oppenheimer Funds therefore had access to Tremont's Funds' investments and had knowledge of Tremont Partners' use of Madoff.

119.   Pursuant to the Oppenheimer Tremont MNF and Oppenheimer Tremont Opportunity's prospectuses, Manzke and Schulman were part of the management team of the funds, and were "primarily responsible for selecting Portfolio Managers and allocating the Fund's assets among the Portfolio Managers."

120.   Oppenheimer Tremont MNF and Oppenheimer Tremont Opportunity each had an eight member Board of Managers, the function of which, according to their Statement of Additional Information, was to "manage and control the business affairs of the Fund, including the complete and exclusive authority to establish policies regarding the management, conduct and operation of the Fund's business."  Of the eight members of the Board of Managers of the funds, six had affiliations with either MassMutual or Oppenheimer.

121.   Due to its exposure to Madoff's Ponzi scheme, Oppenheimer closed the Oppenheimer Tremont MNF as of March 25, 2009.

122.   On March 31, 2009, in the wake of the collapse of the funds, Kurt Wolfgruber, who was a director of Tremont Capital, "resigned" from his position as Oppenheimer Funds' Chief Investment Officer, no doubt as a result of the Oppenheimer Tremont funds' exposure to Madoff on his watch. Wolfgruber's resignation was announced in a press release issued by Oppenheimer Funds, which announced in the same press release that Oppenheimer Funds was making additional staffing & changes to "enhance its risk management capabilities" to assure its clients and the investment public that its risk monitoring procedure would not expose its clients to unscrupulous investment managers like Madoff in the future.

**COUNT I**
**For Violations of Section 10(b) of the Exchange Act**
**And Rule 10b-5 of the Securities and Exchange Commission**
**(Against The Tremont Defendants)**

123.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

124.    This Count is asserted against the Tremont Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

125.    The Tremont Defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, practices, and courses of business which operated as a fraud and deceit upon Plaintiff, and made various deceptive and untrue statements of material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce Plaintiff to purchase limited partnership investment interests in the XL Fund.

126.    The Tremont Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly or recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to Plaintiff as particularized above, including the XL Offering Memorandum and Client Account Statements. The Tremont Defendants' knowledge and/or conscious ignorance that their statements and actions were materially false and misleading is evidenced by, among other things: (i) admissions they made in the financial press and in public interviews regarding their concerns about Madoff and his operations; (ii) internal e-mails they sent and received referencing or acknowledging a host of highly suspicious facts and circumstances regarding Madoff and

BLMIS; (iii) internal reports they prepared highlighting a host of serious risks going to the essence of the Madoff Ponzi scheme; (iv) red flags and warning signs about BLMIS and Madoff that were publicly available and which they knew of or had access to; and (v) their receipt of anomalous and inconsistent trade confirmations, account statements and other documents from Madoff and BLMIS.

127.    In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said Defendants, Plaintiff relied, to its detriment, on such misleading statements and omissions in purchasing limited partnerships in the XL Fund.  Plaintiff has suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

128.    By reason of the foregoing, the Tremont Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff in connection with its purchases of limited partnership interests in the XL Fund.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants and the Controlling Defendants)**

129.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

130.    The Defendants named in this Count acted as controlling persons of the Rye Defendants and the Tremont Corporate Defendants within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of, among other things: (i) their ownership in, high

level positions, participation in and/or awareness of the operations of the Rye Defendants and the Tremont Corporate Defendants; and (ii) intimate knowledge of these Defendants' products, sales, accounting, selection of investment advisors and managers, plans and implementation thereof, the Individual Defendants and the Controlling Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Rye Defendants and the Tremont Corporate Defendants, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. These Defendants had the ability to prevent the issuance of the statements or cause the statements to be corrected.

131.    The Individual Defendants and the Controlling Defendants had direct and supervisory involvement in the day-to-day operations and actions of the Rye Defendants and the Tremont Corporate Defendants and, therefore, had the power to control or influence the particular statements giving rise to the securities violations as alleged herein, and exercised the same.

132.    By virtue of their positions as controlling persons, the Individual Defendants and the Controlling Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the wrongful conduct, Plaintiff suffered damages in connection with its purchases of limited partnership interests in the XL Fund.

## COUNT III
## Common Law Fraud
## (Against the Tremont Defendants)

133.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

134.    Plaintiff, in reasonable and justifiable reliance upon the statements and representations made by the Defendants named in this Count, as previously set forth herein, purchased investment interests in the XL Fund.  Plaintiff would not have purchased investment

interests in the XL Fund except for its reliance upon the representations made by Defendants in the XL Offering Memorandum, Client Statements and other materials.

135.    At the time the statements and misrepresentations were made in the XL Offering Memorandum, Client Statements and other materials, these Defendants knew them to be false, or recklessly disregarded their falsity, and intended to deceive Plaintiff by making such statements and representations.

136.    At the time of the false statements, misrepresentations and omissions, set forth above, each of the Defendants named herein intended that Plaintiff would act on the basis of the misrepresentations and omissions contained in the XL Offering Memorandum, Client Statements and other materials, in determining whether to purchase investment interests in the XL Fund. Plaintiff reasonably relied thereon to its detriment in making such decisions.

137.    Had Plaintiff known of the material facts that Defendants wrongfully concealed and misrepresented, and the falsity of the Defendants' representations, Plaintiff would not have purchased investment interests in the XL Fund.

138.    Plaintiff, as a result of its purchase of investment interests in the XL Fund and by reason of the wrongful concealments and misrepresentations by Defendants, has sustained damages, losing all of its respective investments in the XL Fund in an amount yet to be determined, and to be proven at trial.

139.    By reason of the foregoing, Defendants are jointly and severally liable to Plaintiff.

140.    Defendants' fraudulent acts were willful and wanton and Plaintiff is entitled to punitive damages.

## COUNT IV
## Negligent Misrepresentation
## (Against the Tremont Defendants)

141.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

142.    The Tremont Defendants owed Plaintiff a duty to, among other things: (a) act with reasonable care in preparing and disseminating the XL Offering Memorandum, Client Statements and other materials, which were relied upon by Plaintiff in deciding to purchase its investment interests in the XL Fund; and (b) use reasonable diligence in determining the accuracy of and preparing the information contained in the XL Offering Memorandum, Client Statements and other materials.

143.    These Defendants breached their duties to Plaintiff by disseminating false and misleading documents to Plaintiff without investigating, confirming or reviewing the information contained in those materials. As a result of these negligent misrepresentations, Plaintiff was induced to purchase limited partnership interests in the XL Fund.

144.    As a direct, foreseeable and proximate result of these Defendants' negligent misrepresentations, Plaintiff has sustained damages, losing all of its investments in the XL Fund in an amount yet to be determined and to be proven at trial.

145.    By reason of the foregoing, these Defendants are jointly and severally liable to Plaintiff.

**COUNT V**
**Breach of Contract**
**(Against Tremont Partners, Inc.)**

146.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

147.     Plaintiff and Tremont Partners are parties to the Agreement.

148.     Pursuant to the Agreement, Tremont Partners owed Plaintiff contractual obligations to: (i) "utliz[e] the strategies discussed" in the XL Offering Memorandum for the purpose of "generating capital appreciation" and focusing on capital preservation; (ii) choose "suitable parties" to the extent it determined to delegate any of its investment advisory and management responsibilities under the Agreement; and (iii) "invest and reinvest substantially all of the [XL Fund's] assets directly or indirectly through the Reference Entity or through various portfolio managers and/or investment vehicles, within a broad range of financial instruments, securities and transactions. . . ."

149.     Tremont Partners breached these contractual obligations owed to Plaintiff by, among other things: (i) failing to utilize the "investment strategies" set forth in the XL Offering Memorandum, including a commitment to "focus on the preservation of capital"; (ii) failing to delegate to a "suitable party" its investment advisory and management responsibilities; and (iii) failing to invest the XL Fund's assets through the Market Fund using legitimate "financial instruments, securities and transactions."

150.     In addition, the Agreement obligates Tremont Partners to be "responsible for the day-to-day and other operations of the [XL Fund], and, together with its "Affiliates," to "devote as much of their time to the investment activities of [the XL Fund] as the General Partner deems reasonable under the circumstances." Tremont Partners breached these obligations as well. In

this regard, Tremont Partners did not take responsibility for the day-to-day operations of the XL Fund; instead, it allowed BLMIS and Madoff to essentially operate both the Market Fund and the XL Fund without any effective oversight or monitoring whatsoever.

151.   Under the Agreement, Tremont Partners was also obligated to calculate the Net Asset Value of the XL Fund and to calculate the capital accounts of the limited partners, including Elendow. To fulfill this obligation, Tremont Partners should have monitored and verified the value of the securities and other assets owned by the Market Fund and the XL Fund. In addition, Tremont Partners was obligated to provide reports to Elendow for use in calculating its tax liabilities for partnership income.

152.   Tremont Partners breached its obligations to calculate the Net Asset Value and the value of Plaintiff's capital account, because it did not properly monitor or verify the value of the holdings of the Market Fund and the XL Fund.  As a result, Tremont Partners provided accounts statements and other reports to Plaintiff that did not reflect the true value of its investments in the XL Fund and reflected income that did not truly exist.

153.   As a direct and proximate result of these contractual breaches, Plaintiff lost all of its investment in the XL Fund.

154.   By virtue of the foregoing, Plaintiff has been damaged in an amount to be determined at trial.

**COUNT VI**
**Breach of Fiduciary Duty**
**(Against the Rye Defendants and the Tremont Corporate Defendants)**

155.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

156.     The Rye Defendants and the Tremont Corporate Defendants owed Plaintiff fiduciary duties of good faith, full disclosure and complete candor. The Rye Defendants and the Tremont Corporate Defendants breached the fiduciary duties they owed to Plaintiff, and acted in bad faith and/or with gross negligence, by failing to provide full, complete and accurate disclosures regarding the XL Fund, the Market Fund, BLMIS, Madoff and Plaintiff's investments. The actions of the Rye Defendants and the Tremont Corporate Defendants, as particularized above, constituted an intentional dereliction of their duties and/or conscious disregard of those duties to Plaintiff.

157.     As a result of the Rye Defendants' and the Tremont Corporate Defendants' breaches of their fiduciary duties, Plaintiff purchased and/or held partnership interests in the XL Fund that were worthless, causing Plaintiff to lose all of its investment.

158.     Plaintiff's injury was distinct and separate from any injury purportedly sustained by the XL Fund. In this regard, Plaintiff's loss was not caused by general corporate mismanagement, waste or diminution in the value of its interests in the XL Fund. Instead, Plaintiff's loss was sustained by virtue of being fraudulently induced to part with monies based upon the Rye Defendants' and the Tremont Corporate Defendants' false and misleading disseminations about, among other things, the XL Fund, the Market Fund and the Market Fund's "Investment Manager." Those disseminations were designed to assure Plaintiff that the XL Fund,

the Market Fund and BLMIS were legitimate business enterprises when, as demonstrated above, they were part and parcel of a vast Ponzi scheme.

159.  Furthermore, Plaintiff sustained injuries that were not sustained by other investors in the XL Fund.  Specifically, prior to December 2008 when the Madoff Ponzi scheme was exposed, a number of XL Fund investors were able to redeem their partnership interests and retrieve the monies they had invested.  Thus, unlike Plaintiff, these individuals did not sustain losses in connection with the Rye Defendants' and the Tremont Corporate Defendants' breaches of fiduciary duty.

160.  By virtue of the foregoing, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT VII
### Aiding and Abetting Breach of Fiduciary Duty
### (Against the Individual Defendants and the Controlling Defendants)

161.  Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

162.  The Rye Defendants and the Tremont Corporate Defendants owed fiduciary duties to Plaintiff as a limited partner in the XL Fund, and, as particularized above, breached those fiduciary duties to Plaintiff.

163.  The Individual Defendants and the Controlling Defendants provided substantial assistance to, encouraged, and/or aided and abetted the breaches of fiduciary duties through, among other things: (i) their preparation and/or review of the false and misleading documents disseminated to Plaintiff; (ii) dealings and interaction with Madoff and BLMIS; (iii) marketing and advertising of the XL Fund and other funds operated by the Rye Defendants and Tremont

Corporate Defendants; and (iv) structuring of some or all of the swap transactions between the XL Fund and its counterparties.

164.    The Defendants named in this Count had actual knowledge of or consciously ignored the Rye Defendants' and the Tremont Corporate Defendants' breaches of fiduciary duty as a result of, among other things, their: (i) awareness of highly suspicious facts and circumstances involving Madoff and BLMIS; (ii) abject failure to determine whether Madoff and BLMIS were actually trading securities as represented in the XL Offering Memorandum; and (iii) public admissions of concerns they had about Madoff and BLMIS.

165.    The actions of the Defendants named in this Count directly and proximately caused Plaintiff's losses in the XL Fund.

166.    By virtue of the foregoing, Plaintiff has been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands judgment:

A.       Awarding compensatory damages against Defendants in favor of

Plaintiff against all Defendants for damages sustained as a result of

Defendants' wrongdoing together with interest therein;

B.       Awarding prejudgment interest;

C.       Awarding punitive damages as appropriate;

D.       Awarding extraordinary, equitable and/or injunctive relief as

permitted by law (including, but not limited to, disgorgement);

E.       Awarding Plaintiff its costs and disbursements of this suit,

including reasonable attorneys' fees, accountants' fees and experts'

fees; and

F.       Awarding such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: New York, New York

December 23, 2011                                        **McLAUGHLIN & STERN, LLP**

By:_____
Lee S. Shalov, Esq.
Jon Paul Robbins, Esq.
lshalov@mclaughlinstern.com
probbins@mclaughlinstern.com
260 Madison Avenue
New York, New York 10016
(212) 448-1100

*Attorneys for Plaintiff*